UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD ALLEN HAMMONDS, : CIVIL NO: 3:12-CV-00236
:
        Plaintiff :
: (Judge Brann)
   v. :
: (Magistrate Judge Schwab)
SUPERINTENDENT B. COLLINS, :
*et al.,* :
:
      Defendants :

## REPORT AND RECOMMENDATION

### I. Introduction.

The plaintiff, Richard Allen Hammonds, began this case when he was prisoner at the State Correctional Institution at Frackville. He claims that the defendants retaliated against him for filing grievances and civil lawsuits. He claims that they denied him medical care, poisoned his food trays, and used excessive force against him. He also claims that the defendants have kept him in solitary confinement since May of 2010, that his solitary confinement has caused his mental state to deteriorate, and that he is being denied mental health treatment. After filing this case, Hammonds was transferred from the State Correctional Institution at Frackville to the State Correctional Institution at Fayette. He has now filed a motion for a preliminary injunction contending that he is being kept in the Special Management Unit at Fayette

and that he is being denied mental health treatment there.   For the reasons set forth below, we recommend that Hammonds's motion for a preliminary injunction be denied.

## II. <u>Background and Procedural History</u>.

### A. <u>Hammonds's Complaint</u>.

#### 1. <u>Allegations</u>.

Hammonds names the following 23 individuals as defendants in his amended complaint: (1) Robert B. Collins, the Superintendent at the State Correctional Institution at Frackville; (2) Deputy Superintendent Kavolchik; (3) Deputy Superintendent Lorady; (4) Grievance Coordinator Damiter; (5) Corrections Classification Program Manager Sweeney; (6) Major Keller; (7) Captain Clark; (8) Alan Santarelli, a psychology manager; (9) Dr. Ingrid Li; (10) Health Care Administrator Vicki Stanishefski; (11) Myron Stanishefski, Vicki's husband and the Health Care Administrator at SCI-Dallas; (12) Mary Alice Kuras, Registered Nurse Manager; (13) Physician's Assistant Nancy Palmigiano; (14) Physician's Assistant Kyle Mummey; (15) Lieutenant Manbeck; (16) Sergeant Hannon; (17) Sergeant

Purcell; (18) Corrections Officer Alshefski; (19) Corrections Officer Kramer; (20) Corrections Officer Anspach; (21) Corrections Officer Moss; (22) Corrections Officer Kufro; and (23) Corrections Officer Evans.   Hammonds alleges the following facts in his amended complaint.

At the time he filed this case, Hammonds was confined in the Restricted Housing Unit (RHU) at SCI-Fackville.   He alleges that at a Program Review Committee (PRC) hearing in September of 2011, defendant Kavolchik, in front of defendants Lorady and Santarelli, expressed malice toward him because he had filed a 1983 action against Kavolchik and his colleagues.   Kavolchik threatened to place Hammonds on the Restricted Release List, resulting in indefinite lockdown in the RHU, if Hammonds did not cease exercising his right to petition.   Hammonds alleges that Santarelli was at the PRC hearing that day seeking Kavolchik's approval to send him to a Special Assessment Unit for an evaluation because his mental state was deteriorating due to the routine boredom and the constant illumination he had to endure in the RHU.   According to Hammonds, Kavolchik told Santarelli to never again ask him about "this fucking retard."   Further, Kavolchi accused Hammonds of being uncooperative and assaultive toward his staff, and he told Hammonds that he would

make sure that he did not get an evaluation until his behavior changed and that if his behavior did not change he would remain in the RHU forever. Santarelli intervened and told Kavolchik that Hammonds has several mental impairments—including post traumatic stress disorder, manic depression, depression, and anti-social personality disorder—that make him incapable of controlling his behavior. Ignoring this, Kavolchik ended the hearing.

Hammonds alleges that a couple of months later he became aware that Officers Long, Wiedow, and Kalce[1] were tampering with his food trays. According to Hammonds, on November 10, 2011, he ate food that they had poisoned, and he instantly became sick. He alleges that he vomited, had a severe headache, and had severe pain in his chest, stomach, and trachea. He asserts that he requested that Officer Long contact the medical department, but Long refused and told him to sign up for sick call the next day. He alleges that he was in pain throughout the night.

---

[1] Hammonds has not named Long, Wiedow, and Kalce as defendants in this case. He has named them as defendants in another of his cases. *See Hammonds v. Walsh,* 3:11-CV-1666 (M.D.Pa.).

The next day, Hammonds alleges that he signed up for sick call, and defendant Palmigiano saw him at his cell door. He alleges that he explained to her his symptoms—violent cramps, bloating of the stomach, nausea, periodic unconsciousness, nose bleeds, burning and itching sensations in his chest and trachea, vomiting, and blood in his stool—which caused him significant pain. After Hammonds characterized his symptoms as chronic, Palmigiano began to debate with him the difference between chronic and nonchronic conditions. Claiming that Hammonds was disrespectful, she walked away without providing him with medical treatment.

The next day, Hammonds again signed up for sick call. This time he spoke to defendant Mummey. According to Hammonds, after he had explained his symptoms and defendant Palmigiano's response, defendant Mummey told Hammonds that nothing was wrong with his internal organs and to "put that in your lawsuit nigger." Hammonds characterizes Mummey's actions as entering into a "code of silence to conspire to suppress and undermine the seriousness" of the situation.

According to Hammonds, although he signed up for sick call numerous times because his internal organs were burning and were not functioning properly causing him significant pain, defendants Palmigiano and Mummey think that he is faking and they leave him to languish in pain without even taking the necessary steps to figure out why he is in pain. Hammonds also believes that they have altered his medical records.

Hammonds filed grievances about his encounters with defendants Palmigiano and Mummey, but he contends that defendant Vicki Stanishefski failed to properly investigate his allegations. Hammonds asserts that she failed to do so because he had filed a Section 1983 complaint against her husband, defendant Myron Stanishefski, and because Myron ordered her to inflict unnecessary and wanton pain on him as retaliation for the lawsuit. Hammonds alleges that defendants Stanishefski and Kuras are making medical decisions about him based on, and in order to punish him for, his litigation activities. Hammonds filed a motion for a temporary restraining order and preliminary injunction in one of his cases, and, as a result, defendants Mummey, Palmigiano,

Kuras, and Vicki Stanishefski allegedly altered his medical records in an attempt to undermine the seriousness of his need for medical treatment.

Hammonds alleges that, on December 18, 2011, defendant Hannon called him sexually derogatory names because he had filed grievances and a Section 1983 lawsuit, and Hannon threatened to assault him if he did not quit exercising his right to petition. Hammonds alleges that defendant Hannon also told other prisoners about his fabricated misconduct history from other institutions, and, as a result, other prisoners taunted and harassed Hammonds by calling him sexually derogatory names causing him mental anguish. On another occasion, defendant Hannon allegedly used sexually derogatory language and told Hammonds "thats for being a snitch." Hammonds filed a grievance about the harassment and retaliation.

According to Hammonds, later in December, defendants Purcell, Kramer, Anspach, and Moss used excessive physical force against him. He also alleges that Purcell used obscene and derogatory language, and referring to a temporary restraining order hearing that had occurred two days earlier, Purcell called him a snitch. This incident allegedly occurred when Kramer and Anspach

were passing out breakfast trays and Purcell told Kramer not to give Hammonds a breakfast tray because he is a snitch. Purcell also allegedly told Hammonds: "Sign off [on] these grievances and we'll give you a tray (meal)." In order to receive his meal, Hammonds alleges that he said that he would comply, but when the officers were collecting the meal trays after the meal and Purcell asked Hammonds where his request slip signing off on the grievances was, Hammonds stated that he would not sign off on the grievances. In response, Purcell allegedly told the other officers not to collect Hammonds's tray until he had signed off on the grievances and Section 1983 suit. Later, Purcell issued a misconduct report to Hammonds. According to Hammonds, that sparked a series of retaliatory misconducts and a campaign of violence against him.

Still later the same day, defendant Purcell allegedly threatened to beat Hammonds during an upcoming trip to a medical appointment, and after Hammonds requested the presence of a lieutenant, Purcell called Hammonds a derogatory name and walked off. But, according to Hammonds, defendants Kramer and Anspach then threatened him by telling him: " We're going to teach your nigger ass a lesson for snitching on our colleagues." Defendant Moss also

told Purcell: "We can't leave that slot open[.] Close his fucking hand in there." According to Hammonds, Purcell then snatched his sleeve out of the slot in the cell door, and Kramer closed the slot on his hand causing him excruciating pain and resulting in a permanent scar and disfunction of his left hand. Kramer then allegedly advised Hammonds that "this is only the beginning you rat bastard."

Also that day, defendant Kramer allegedly attempted to serve Hammonds food drenched in poisonous disinfectant and detergent. The food was in a brown paper bag that tore because it was wet. When Hammonds asked why the food and the bag were wet, Kramer allegedly told him "its rat poison, the same [as] you've been eat[ing] nigger." Hammonds refused the meal.

According to Hammonds, the retaliation and ill treatment continued. On December 29, 2011, defendants Alshefski and Kufro allegedly shouted obscenities at Hammonds and banged on his cell door in order to provoke him. While passing out breakfast meals, Alshefski allegedly told Hammonds that he would give him a breakfast tray if he signed off on the grievances against him and Hannon. According to Hammonds, he refused and Alshefski walked away without giving him a food tray. Hammonds alleges that the same thing occurred

at lunch that day.   While this was happening, defendants Keller and Sweeney walked onto the block, and Hammonds asked to speak to Keller.   But, Hammonds alleges, before Keller reached his cell, Alshefski falsely told Keller that he had not given Hammonds a tray because Hammonds spit on him. Hammonds told Keller that he did not spit on Alshefski and that Alshefski was retaliating because he had filed a grievance about him.   Defendant Sweeney allegedly told Keller not to do anything for that "political prisoner," and as the two were walking away Keller told Sweeney that he remembers Hammonds from Dallas and "he's an asshole."   Defendants Alshefski and Kufro then allegedly told Hammonds that that is what happens to "niggers" who cause problems and that if he signs off on the grievances everything will cease.   Hammonds again refused to sign off on the grievances.

Hammonds alleges that he asked defendants Alshefski and Kufro to contact the psychological department because he felt suicidal.   According to Hammonds, instead of contacting the psychological department, they told him to kill himself or they would kill him.   Hammonds alleges that he seriously considered hanging himself, but other prisoners talked him out of it.

Hammonds alleges that he spoke to defendant Manbeck in an attempt to stop the deprivations and retaliation that he was experiencing, but this was to no avail. In fact, Hammonds alleges that defendant Manbeck said that he had authorized the actions taken against Hammonds, that he will do nothing for him, and that Hammonds will not be going to yard, to shower, or to the law library or getting soap or toilet paper. Defendant Manbeck also allegedly told Hammonds that if he tests his resolve he would beat him and that Hammonds is "the jailhouse lawyer" and he should file a lawsuit.

According to Hammonds, in January of 2012, he was approved as an indigent, but defendants Evans and Manbeck deprived him of soap, toilet paper, shampoo, a writing tablet, envelopes, etc. Defendant Manbeck allegedly taunted Hammonds saying "you can't file a lawsuit without your materials."

Hammonds alleges that he wrote to defendants Clark, Lorady, Kavolchik, Damiter, Keller, and Collins seeking redress, but these defendants entered into a "code of silence" to suppress staff's misconduct. By doing so, Hammonds asserts that they sent a message to their subordinates that it is all right

to intimidate and retaliate against prisoners and that there will be no consequences for doing so.

On January 19, 2012, Hammonds spoke to defendant Collins and Damiter at his cell door about their subordinates' actions, and he told them that he was being discriminated and retaliated against and denied basic necessities. According to Hammonds, they asked him why he had been transferred there, he told them "staff assaults," and defendant Collins told him that it was a slap in their faces that he had not been charged "so now here's yours." Defendant Collins allegedly further stated: "You think I care if you['re] being treated inhumanely[.] I believe you spit on Alshefski." Hammonds alleges that defendants Collins, Kavolchik, and Clark knew of prior incidents of retaliation similar to what he had experienced, but they failed to take reasonable measures to abate the practices, which, according to Hammonds, sent a message of approval to their subordinates and lead to the campaign of harassment and retaliation against him.

According to Hammonds, during his stay at SCI-Frackville, he sought psychological treatment for his mental disorders, but his requests and pleas for treatment were denied or ignored. He alleges that, since May of 2010, he was in

solitary confinement 23 to 24 hours a day, with no television, no radio, no

physical or social contact with people, no job, no vocational training, no

rehabilitative programming, no group meals, no exercise, and no religious

services.   He alleges that he is housed around inmates who daily taunt him about

his mental impairments, and he is targeted by the defendants to provoke him to act

out so that they may issue him misconducts, which ultimately extend his stay in

solitary confinement.   According to Hammonds, his solitary confinement has

caused him to deteriorate mentally, emotionally, physically, and spiritually, and

he is at risk of suffering a psychotic breakdown and committing suicide.

Hammonds alleges that he is past his minimum release date, but a Department of

Corrections' policy prohibits inmates in the RHU from even being reviewed for

parole.

        Hammonds alleges that defendant Clark had the librarian take his legal

materials to Clark's office, and Clark copied those materials for his files.

According to Hammonds, this is how the defendants knew of his other civil suit

before it was even filed, and this is what triggered the campaign of retaliation.

Although defendants Li and Santarelli diagnosed Hammonds as suffering from anti-social personality disorder, manic depression, depression, and post traumatic stress disorder, Hammonds alleges that he is being punished for actions that are the result of his disorders. He contends that defendants Li and Santarelli have misdiagnosed him and that they have altered his medical records. He also contends that by disclosing confidential medical information about him to nonmedical personnel they breached a contract to keep his medical records confidential. According to Hammonds, defendants Moss, Kramer, Anspach, Alshefski, Purcell, Hannon, Kufro, Evans, and Manbeck know of his mental diagnosis and they exploit that information to cause him mental anguish.

According to Hammonds, Since his incarceration at SCI Frackville, he has attempted suicide three times. After two of those attempts, he was taken to the psychiatric observation cell (POC). According to Hammonds, the POC is dubbed the torture chamber because it has urine, feces, semen, vomit, and old food everywhere including the walls, floors, bed, toilet, and sink. Hammonds alleges that there is no running water, no soap, no toilet paper, no cleaning supplies, and no food utensils, and if a prisoner speaks out about the lack of

14

necessities, he is deprived of his food tray.   Although a prisoner is sent to the

POC for mental rehabilitation, Hammonds contends that he is instead tortured

under the most inhumane conditions known to man including constant bright

light.

　　　According to Hammonds, defendants Collins, Kavolchik, Lorady,

Sweeney, Clark, Damiter, and Manbeck have tried to persuade defendants Li and

Santarelli to perceive him as less than human by dragging his misconduct history

though the record.   But, Hammonds alleges, his misconduct history is actually

proof of his mental deterioration.   Hammonds allegedly has repeatedly pleaded

with Collins, Kavolchik, Lorady, Sweeney, Li, Santarelli, and Damiter to allow

him to go to the mental health clinic at SCI-Waymart.   Although he is eligible for

a mental health program called the Special Secure Needs Unit designed for

mentally disabled prisoners, Hammonds alleges that he is being excluded from

that program because of his disabilities and because of his civil litigation

activities.

　　　According to Hammonds, defendant Li is not qualified to be a

psychiatrist since she is only a doctor of medicine and she has not taken the

psychotherapist-patient oath. Because she has not taken that oath, Hammonds contends that it was easier for her to breach a signed confidentiality contract she had with Hammonds. Hammonds alleges that that although defendants Clark, Sweeney, Collins, Kavolchik, Lorady, Damiter, Vicki Stanishefski, Kuras, Santarelli, Palmigiano, Keller, and Mummey knew of such fraud, they conspired to deprive him of his rights.

Hammonds alleges that the defendants are aware of his need for mental health treatment, and he alleges that he has been bounced around on numerous psychotropic medications seeking a cure for his mental disease. According to Hammonds, his reality testing and his perceptual accuracy are marked by significant deficits, and he tends to misinterpret environmental stimuli.

Hammonds claims that all of the defendants have entered into a "code of silence" in conspiracy to deprive him of adequate mental and medical care because of his legal activities. And he claims that the defendant retaliated against him because he filed grievances and lawsuits. He also claims that they discriminated against him in violation of the Americans with Disabilities Act, that they violated the Eighth Amendment, and that they violated his equal protection

and due process rights. He also presents 42 U.S.C. § 1983 and 42 U.S.C. § 1985

conspiracy claims. He claims that defendants Li and Santarelli breached a

contract not to disclose his confidential mental health records to nonmedical

personnel. He also presents state constitutional claims and state law claims of

intentional infliction of emotional distress. He seeks declaratory and injunctive

relief as well as compensatory and punitive damages.


## 2. <u>Motions to Dismiss</u>.

In June of 2012, defendants Palmigiano and Mummey filed a motion to

dismiss the amended complaint, and, in August of 2012, defendants Collins,

Kavolchik, Lorady, Damiter, Sweeney, Keller, Clark, Santarelli, Vicki

Stanishefski, Myron Stanishefski, Kuras, Manbeck, Hannon, Purcell, Alshefski,

Kramer, Anspach, Moss, Kufro, and Evans (corrections defendants) filed a

separate motion to dismiss the amended complaint.

In deciding the motions to dismiss, the court dismissed the following claims: all

claims against defendants Vicki and Myron Stanishefski, the 42 U.S.C. §§1983 and

1985 claims against the defendants in their official capacities, the ADA claims against

the defendants in their individual capacities, the conspiracy claims, the breach of contract claims, the claims for damages under the Pennsylvania Constitution, the claims based solely on allegations of verbal harassment, the equal protection claims against defendants Mummey and Palmigiano, the retaliation claim against defendant Palmigiano, the retaliation claims based on misconducts except as to the retaliatory misconduct claim based on the misconduct issued by defendant Purcell, the due process claims based on the defendants' failure to interview witness in connection with Hammonds's grievances, the due process claims arising from the process associated with the misconduct hearings except Hammonds's due process claim that that he was unable to obtain an impartial hearing, and the intentional infliction of emotional distress claims against the correctional defendants.

Many of Hammonds's claims, however, survived the motion-to-dismiss stage of the proceedings including his medical and mental health treatment claims, excessive force claims, conditions-of-confinement claims, the bulk of his retaliation claims against the corrections defendants, and his equal protection claims against the corrections defendants based on the denial of mental health treatment.

**B.  Motion for Preliminary Injunction.**

In November of 2012, Hammonds informed that court that he had been transferred from the State Correctional Institution at Frackville to the State Correctional Institution at Fayette.   Currently pending is Hammonds's motion for a preliminary injunction.[2]   Hammonds asserts that he is now housed in the Special Management Unit[3] at Fayette, where he is taunted by prisoners who are not mentally ill and where, according to Hammonds, there is "virtually no mental health programming." *Doc. 110*   at ¶8.   He asserts that, because of his solitary confinement, his mental health has deteriorated and he is suicidal.   He is seeking an order requiring defendant Collins and the Pennsylvania Department of Corrections to remove him from the Special Management Unit, to have him examined by a psychologist or psychiatrist, and to place him in the proper mental health unit.   More specifically, he seeks an order sending him to the State Correctional Institution at Waymart for an examination, a report by a psychiatrist, and a prescription for a course of

---

2  Although he titled the motion as a motion for a permanent injunction, in his brief Hammonds makes clear that he is seeking a preliminary injunction.

3  At times Hammonds refers to his confinement in the Special Management Unit, while at other times he refers to his confinement in the Secure Management Unit.

psychotherapy.   The motion for a preliminary injunction has been briefed, and we address it now in this Report and Recommendation.

## III. <u>Discussion</u>.

A motion for a preliminary injunction is governed by Rule 65 of the Federal Rules of Civil Procedure and is judged against exacting legal standards.   "A party seeking a preliminary injunction must satisfy the traditional four-factor test: (1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010).

A preliminary injunction is not granted as a matter of right. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).   Rather, it is an extraordinary remedy that places precise burdens on the moving party, and "[t]he preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).   "It has been

well stated that upon an application for a preliminary injunction to doubt is to deny."

*Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

Further, where the requested preliminary injunction "is directed not merely at preserving the *status quo* but . . . at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir. 1980). Mandatory injunctions should be used sparingly. *United States v. Price,* 688 F.2d 204, 212 (3d Cir. 1982). Indeed, a request for mandatory proactive injunctive relief in the prison context "must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper,* 60 F.3d 518 (3d Cir. 1995)(quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir. 1982)).

These limitations on the power of courts to enter injunctions in a correctional context are further underscored by statute. Specifically, preliminary injunctive relief in a civil action with respect to prison conditions, such as the action here, must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm. *See* 18 U.S.C. § 3626(a)(2).

Further, in considering a motion for preliminary injunctive relief, the court must give substantial weight to any adverse impact such relief may have on public safety or on the operation of the criminal justice system. *Id.*

For an inmate to sustain his burden of proof that he is entitled to a preliminary injunction under Fed.R.Civ.P. 65, he must demonstrate both a reasonable likelihood of success on the merits and irreparable harm if the requested relief is not granted. *Abu-Jamal v. Price,* 154 F.3d 128, 133 (3d Cir. 1998); *Kershner, supra,* 670 F.2d at 443. "As these elements suggest, there must be 'a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.'" *Ball v. Famiglio*, 396 F. App'x 836, 837 (3d Cir. 2010) (quoting *Little v. Jones,* 607 F.3d 1245, 1251 (10th Cir. 2010)(quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir. 1994)). In assessing a motion for preliminary injunction, the court must also consider the harm to the defendants and whether granting the preliminary injunction will be in the public interest .*New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012).

Judged against these exacting standards, Hammonds's motion for a preliminary injunction fails. At the outset, Hammonds cannot meet the first element for such injunctive relief since he cannot show a reasonable likelihood of success on the merits of the claim that he has been inappropriately placed in the Special Management Unit at Fayette and that he is not receiving mental health treatment there. He has not raised such claims in his complaint or amended complaint, and the reason he has not done so is simple—he was not transferred to the State Correctional Institution at Fayette until November of 2012, well after he filed the complaint and amended complaint in this case. Since Hammonds is seeking a preliminary injunction regarding conditions that have only recently arisen and which are not the subject of the claims in this case, he has not shown a relationship between the injury claimed in his motion and the conduct asserted in his complaint. Moreover, since the conditions about which he complains in his motion arose after he filed this action, it necessarily follows that he did not exhaust administrative remedies as to those conditions prior to filing this case as required by 42 U.S.C. § 1997e(a). Accordingly, Hammonds has not shown a likelihood of success on the merits.

Further, we also note that granting the injunctive relief requested by Hammonds, which would effectively have the court making *ad hoc*, and individual, decisions concerning the treatment of a single prisoner, could harm both the defendants and the public's interest. In this prison context, the defendants' interests and the public's interest in penological order could be adversely affected if the court began dictating the treatment for Hammonds, one inmate out of thousands in the state prison system. Therefore, considerations of the harm to the defendants and the public's interest also weighs heavily against Hammonds in this case.

In sum, Hammonds has not demonstrated a likelihood of success on the merits. Moreover, granting this extraordinary relief could harm the public's interest and the interests of the opposing parties. An assessment of the factors which govern issuance of such relief under Fed.R.Civ.P. 65, therefore, weighs against Hammonds and compels us to recommend that the court deny his motion for a preliminary injunction.

## IV. <u>Recommendation.</u>

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that Hammonds's motion (doc. 107) for a preliminary injunction be denied and that the case be remanded to the undersigned for further proceedings.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 18th day of June, 2013.


*__Susan E. Schwab__*
Susan E. Schwab
United States Magistrate Judge