UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD ALLEN HAMMONDS, | : | 3:12-CV-00236 |
| | : | |
| Plaintiff | : | (Judge Brann) |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| SUPERINTENDENT B. COLLINS, | : | |
| *et al.,* | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

The plaintiff, Richard Allen Hammonds, is a state prisoner who is currently confined at the State Correctional Institution at Camp Hill.   His claims in this case, however, arise from his confinement at the State Correctional Institution at Frackville.   The amended complaint names 23 defendants and asserts a plethora of claims.   The Court previously dismissed many claims and granted summary judgment as to others, but many claims still remain.   The remaining claims include claims that the defendants retaliated against Hammonds for filing grievances and civil lawsuits, that they denied him medical care, that they poisoned his food, and that they used excessive force against him.   Hammonds also claims that the defendants kept him in solitary confinement for years, that his solitary confinement

caused his mental state to deteriorate, and that he was denied mental health treatment.

In this Report and Recommendation, we address a motion for summary judgment filed by twenty of the defendants, who refer to themselves as the corrections defendants.   For the reasons set for the below, we recommend that the motion for summary judgment be granted in part and denied in part.   Also pending is the corrections defendants' motion for leave to file a second summary judgment motion and Hammonds's motion for a separate trial of the remaining claim against one of the defendants.   We recommend that those motions be denied.

## II.   Background and Procedural History.

### A.   The Amended Complaint.

Hammonds names the following 23 individuals as defendants in his amended complaint: (1) Robert B. Collins, the Superintendent at SCI-Frackville; (2) Deputy Superintendent Kavolchik; (3) Deputy Superintendent Lorady; (4) Grievance Coordinator Damiter; (5) Corrections Classification Program Manager Sweeney; (6) Major Keller; (7) Captain Clark; (8) Alan Santarelli, a psychology manager; (9) Dr. Ingrid Li; (10) Health Care Administrator Vicki Stanishefski; (11) Myron Stanishefski, Vicki's husband and the Health Care Administrator at SCI-Dallas;

(12) Mary Alice Kuras, Registered Nurse Manager; (13) Physician's Assistant Nancy Palmigiano; (14) Physician's Assistant Kyle Mummey; (15) Lieutenant Manbeck; (16) Sergeant Hannon; (17) Sergeant Purcell; (18) Corrections Officer Alshefski; (19) Corrections Officer Kramer; (20) Corrections Officer Anspach; (21) Corrections Officer Moss; (22) Corrections Officer Kufro; and (23) Corrections Officer Evans.   Hammonds alleges the following facts in his amended complaint.

At the time he filed this case, Hammonds was confined in the Restricted Housing Unit (RHU) at SCI-Frackville.   He alleges that at a Program Review Committee (PRC) hearing in September of 2011, defendant Kavolchik, in front of defendants Lorady and Santarelli, expressed malice toward him because he had filed a 42 U.S.C. § 1983 action against Kavolchik and his colleagues.   Kavolchik allegedly threatened to place Hammonds on the Restricted Release List, resulting in indefinite lockdown in the RHU, if Hammonds did not stop exercising his right to petition.   Hammonds alleges that Santarelli was at the PRC hearing that day seeking Kavolchik's approval to send him to a Special Assessment Unit (SAU) for an evaluation because his mental state was deteriorating due to the routine boredom and the constant illumination he had to endure in the RHU.   According to Hammonds, Kavolchik told Santarelli to never again ask him about "this fucking retard." Further, Kavolchik allegedly accused Hammonds of being uncooperative and

assaultive toward his staff, and he told Hammonds that he would make sure that he did not get an evaluation until his behavior changed and that, if his behavior did not change, he would remain in the RHU forever.   Hammonds alleges that Santarelli intervened and told Kavolchik that Hammonds has several mental impairments—including post-traumatic stress disorder, manic depression, depression, and anti-social personality disorder—that make him incapable of controlling his behavior.   Ignoring this, Kavolchik ended the hearing.

Hammonds alleges that a couple of months later he became aware that Officers Long, Wiedow, and Kalce[1] were tampering with his food trays. According to Hammonds, on November 10, 2011, he ate food that they had poisoned, and he instantly became sick.   He alleges that he vomited, had a severe headache, and had severe pain in his chest, stomach, and trachea.   He asserts that he requested that Officer Long contact the medical department, but Long refused and told him to sign up for sick call the next day.   He alleges that he was in pain throughout the night.

---

[1]  Hammonds did not named Long, Wiedow, and Kalce as defendants in this case. He named them as defendants in another of his cases, *see Hammonds v. Walsh,* 3:11-CV-1666 (M.D.Pa.), which case ended after a jury verdict in favor of the defendants.

4

The next day, Hammonds alleges that he signed up for sick call, and defendant Palmigiano saw him at his cell door.   He alleges that he explained to her his symptoms—violent cramps, bloating of the stomach, nausea, periodic unconsciousness, nose bleeds, burning and itching sensations in his chest and trachea, vomiting, and blood in his stool—which caused him significant pain. After Hammonds characterized his symptoms as chronic, Palmigiano began to debate with him the difference between chronic and nonchronic conditions. Claiming that Hammonds was disrespectful, she walked away without providing him with medical treatment.

The next day, Hammonds again signed up for sick call.   This time he spoke to defendant Mummey.   According to Hammonds, after he had explained his symptoms and defendant Palmigiano's response, defendant Mummey told Hammonds that nothing was wrong with his internal organs and to "put that in your lawsuit nigger."   Hammonds characterizes Mummey's actions as entering into a "code of silence to conspire to suppress and undermine the seriousness" of the situation.

According to Hammonds, although he signed up for sick call numerous times because his internal organs were burning and were not functioning properly causing him significant pain, defendants Palmigiano and Mummey thought that he was

faking and left him to languish in pain without even taking the necessary steps to figure out why he was in pain.   Hammonds also believes that they altered his medical records.

Hammonds filed grievances about his encounters with defendants Palmigiano and Mummey, but he contends that Vicki Stanishefski failed to properly investigate his allegations.   Hammonds asserts that she failed to do so because he had filed a § 1983 complaint against her husband, Myron Stanishefski, and because Myron ordered her to inflict unnecessary and wanton pain on him as retaliation for the lawsuit.   Hammonds alleges that defendants Stanishefski and Kuras made medical decisions about him based on, and in order to punish him for, his litigation activities. Hammonds filed a motion for a temporary restraining order and preliminary injunction in one of his cases, and, as a result, defendants Mummey, Palmigiano, Kuras, and Vicki Stanishefski allegedly altered his medical records in an attempt to undermine the seriousness of his need for medical treatment.

Hammonds alleges that, on December 18, 2011, defendant Hannon called him sexually derogatory names because he had filed grievances and a §1983 lawsuit, and Hannon threatened to assault him if he did not quit exercising his right to petition. Hammonds alleges that defendant Hannon also told other prisoners about his fabricated misconduct history from other institutions, and, as a result, other

prisoners taunted and harassed Hammonds by calling him sexually derogatory names causing him mental anguish.   On another occasion, defendant Hannon allegedly used sexually derogatory language and told Hammonds "that's for being a snitch."   Hammonds filed a grievance about the harassment and retaliation.

According to Hammonds, later in December, defendants Purcell, Kramer, Anspach, and Moss used excessive physical force against him.   He also alleges that Purcell used obscene and derogatory language, and referring to a temporary restraining order hearing that had occurred two days earlier, Purcell called him a snitch.   This incident allegedly occurred when Kramer and Anspach were passing out breakfast trays and Purcell told Kramer not to give Hammonds a breakfast tray because he is a snitch.   Purcell also allegedly told Hammonds: "Sign off [on] these grievances and we'll give you a tray (meal)."   In order to receive his meal, Hammonds alleges that he said that he would comply, but when the officers were collecting the meal trays after the meal and Purcell asked Hammonds where his request slip signing off on the grievances was, Hammonds stated that he would not sign off on the grievances.   In response, Purcell allegedly told the other officers not to collect Hammonds's tray until he had signed off on the grievances and §1983 suit. Later, Purcell issued a misconduct report to Hammonds.   According to Hammonds,

that sparked a series of retaliatory misconducts and a campaign of violence against him.

Still later the same day, defendant Purcell allegedly threatened to beat Hammonds during an upcoming trip to a medical appointment, and after Hammonds requested the presence of a lieutenant, Purcell called Hammonds a derogatory name and walked off.   But, according to Hammonds, defendants Kramer and Anspach then threatened him by telling him: "We're going to teach your nigger ass a lesson for snitching on our colleagues."   Defendant Moss also allegedly told Purcell: "We can't leave that slot open[.] Close his fucking hand in there."   According to Hammonds, Purcell then snatched his sleeve out of the slot in the cell door, and Kramer closed the slot on his hand causing him excruciating pain and resulting in a permanent scar and disfunction of his left hand.   Kramer then allegedly advised Hammonds that "this is only the beginning you rat bastard."

Also that day, defendant Kramer allegedly attempted to serve Hammonds food drenched in poisonous disinfectant and detergent.   The food was in a brown paper bag that tore because it was wet.   When Hammonds asked why the food and the bag were wet, Kramer allegedly told him "its [sic] rat poison, the same [as] you've been eat[ing] nigger."   Hammonds refused the meal.

According to Hammonds, the retaliation and ill treatment continued.   On December 29, 2011, defendants Alshefski and Kufro allegedly shouted obscenities at Hammonds and banged on his cell door in order to provoke him.   While passing out breakfast meals, Alshefski allegedly told Hammonds that he would give him a breakfast tray if he signed off on the grievances against him and Hannon. According to Hammonds, he refused and Alshefski walked away without giving him a food tray.   Hammonds alleges that the same thing occurred at lunch that day. While this was happening, defendants Keller and Sweeney walked onto the block, and Hammonds asked to speak to Keller.   But, Hammonds alleges, before Keller reached his cell, Alshefski falsely told Keller that he had not given Hammonds a tray because Hammonds spit on him.   Hammonds told Keller that he did not spit on Alshefski and that Alshefski was retaliating because he had filed a grievance about him.   Defendant Sweeney allegedly told Keller not to do anything for that "political prisoner," and as the two were walking away Keller told Sweeney that he remembers Hammonds from Dallas and "he's an asshole."   Defendants Alshefski and Kufro then allegedly told Hammonds that that is what happens to "niggers" who cause problems and that if he signs off on the grievances, everything will cease. Hammonds again refused to sign off on the grievances.

Hammonds alleges that he asked defendants Alshefski and Kufro to contact the psychological department because he felt suicidal.   According to Hammonds, instead of contacting the psychological department, they told him to kill himself or they would kill him.   Hammonds alleges that he seriously considered hanging himself, but other prisoners talked him out of it.

Hammonds alleges that he spoke to defendant Manbeck in an attempt to stop the deprivations and retaliation that he was experiencing, but this was to no avail. In fact, Hammonds alleges that defendant Manbeck said that he had authorized the actions taken against Hammonds, that he would do nothing for him, and that Hammonds would not be going to yard, to shower, or to the law library or getting soap or toilet paper.   Defendant Manbeck also allegedly told Hammonds that if he tests his resolve he would beat him and that Hammonds is "the jailhouse lawyer" and he should file a lawsuit.

According to Hammonds, in January of 2012, he was approved as an indigent, but defendants Evans and Manbeck deprived him of soap, toilet paper, shampoo, a writing tablet, envelopes, etc.   Defendant Manbeck allegedly taunted Hammonds saying "you can't file a lawsuit without your materials."

Hammonds alleges that he wrote to defendants Clark, Lorady, Kavolchik, Damiter, Keller, and Collins seeking redress, but these defendants entered into a

"code of silence" to suppress staff's misconduct.   By doing so, Hammonds asserts that they sent a message to their subordinates that it is acceptable to intimidate and retaliate against prisoners and that there will be no consequences for doing so.

On January 19, 2012, Hammonds spoke to defendants Collins and Damiter at his cell door about their subordinates' actions, and he told them that he was being discriminated and retaliated against and denied basic necessities.   According to Hammonds, after responding to their question about why he had been transferred there and telling them "staff assaults," defendant Collins told him that it was a slap in their faces that he had not been charged and he said "so now here's yours." Defendant Collins allegedly further stated: "You think I care if you['re] being treated inhumanely[.] I believe you spit on Alshefski."   Hammonds alleges that defendants Collins, Kavolchik, and Clark knew of prior incidents of retaliation similar to what he had experienced, but they failed to take reasonable measures to abate the practices, which, according to Hammonds, sent a message of approval to their subordinates and led to the campaign of harassment and retaliation against him.

According to Hammonds, during his stay at SCI-Frackville, he sought psychological treatment for his mental disorders, but the defendants denied or ignored his requests and pleas for treatment.   He alleges that, since May of 2010, he has been in solitary confinement 23 to 24 hours a day, with no television, no radio,

no physical or social contact with people, no job, no vocational training, no rehabilitative programming, no group meals, no exercise, and no religious services. He alleges that he was housed around inmates who daily taunted him about his mental impairments, and he was targeted by the defendants to provoke him to act out so that they may issue him misconducts, which ultimately extended his stay in solitary confinement.   According to Hammonds, his solitary confinement has caused him to deteriorate mentally, emotionally, physically, and spiritually, and he is at risk of suffering a psychotic breakdown and committing suicide.   Hammonds alleges that he is past his minimum release date, but a Department of Corrections' policy prohibits inmates in the RHU from even being reviewed for parole.

Hammonds alleges that defendant Clark had the librarian take his legal materials to Clark's office, and Clark copied those materials for his files. According to Hammonds, this is how the defendants knew of his other civil suit before he even filed it, and this is what triggered the campaign of retaliation.

Although defendants Li and Santarelli diagnosed Hammonds as suffering from anti-social personality disorder, manic depression, depression, and post-traumatic stress disorder, Hammonds alleges that he is being punished for actions that are the result of his disorders.   He contends that defendants Li and Santarelli have misdiagnosed him and that they have altered his medical records.

He also contends that by disclosing confidential medical information about him to nonmedical personnel they breached a contract to keep his medical records confidential.   According to Hammonds, defendants Moss, Kramer, Anspach, Alshefski, Purcell, Hannon, Kufro, Evans, and Manbeck know of his mental diagnosis and they exploit that information to cause him mental anguish.

According to Hammonds, since his incarceration at SCI Frackville, he has attempted suicide three times.   After two of those attempts, he was taken to the psychiatric observation cell (POC).   According to Hammonds, the POC is dubbed the torture chamber because it has urine, feces, semen, vomit, and old food everywhere including the walls, floors, bed, toilet, and sink.   Hammonds alleges that there is no running water, no soap, no toilet paper, no cleaning supplies, and no food utensils, and if a prisoner speaks out about the lack of necessities, he is deprived of his food tray.   Although a prisoner is sent to the POC for mental rehabilitation, Hammonds contends that he is instead tortured under the most inhumane conditions known to man including constant bright light.

According to Hammonds, defendants Collins, Kavolchik, Lorady, Sweeney, Clark, Damiter, and Manbeck have tried to persuade defendants Li and Santarelli to perceive him as less than human by dragging his misconduct history though the record.   But, Hammonds alleges, his misconduct history is actually proof of his

mental deterioration.   Hammonds allegedly has repeatedly pleaded with Collins, Kavolchik, Lorady, Sweeney, Li, Santarelli, and Damiter to allow him to go to the mental health clinic at SCI-Waymart.   Although he is eligible for a mental health program called the Special Secure Needs Unit (SSNU) designed for mentally disabled prisoners, Hammonds alleges that he is being excluded from that program because of his disabilities and because of his civil litigation activities.

According to Hammonds, defendant Li is not qualified to be a psychiatrist since she is only a doctor of medicine and she has not taken the psychotherapist-patient oath.   Because she has not taken that oath, Hammonds contends that it was easier for her to breach a signed confidentiality contract she had with Hammonds.   Hammonds alleges that although defendants Clark, Sweeney, Collins, Kavolchik, Lorady, Damiter, Vicki Stanishefski, Kuras, Santarelli, Palmigiano, Keller, and Mummey knew of such fraud, they conspired to deprive him of his rights.

Hammonds alleges that the defendants are aware of his need for mental health treatment, and he alleges that he has been bounced around on numerous psychotropic medications seeking a cure for his mental disease.   According to Hammonds, his reality testing and his perceptual accuracy are marked by significant deficits, and he tends to misinterpret environmental stimuli.

Hammonds claims that all the defendants entered into a "code of silence" in conspiracy to deprive him of adequate mental and medical care because of his legal activities.   And he claims that the defendants retaliated against him because he filed grievances and lawsuits.   He also claims that they discriminated against him in violation of the Americans with Disabilities Act, that they violated the Eighth Amendment, and that they violated his equal protection and due process rights.   He also presents 42 U.S.C. § 1983 and 42 U.S.C. § 1985 conspiracy claims.   He claims that defendants Li and Santarelli breached a contract not to disclose his confidential mental health records to nonmedical personnel.   He also presents state constitutional claims and state law claims of intentional infliction of emotional distress.   He seeks declaratory and injunctive relief as well as compensatory and punitive damages.

In November of 2012, Hammonds informed the Court that he was transferred from SCI-Frackville to SCI-Fayette.   He later informed the court that he was back at SCI-Frackville.   Later still, he was transferred to SCI-Smithfield and then to SCI-Camp Hill, where he is currently incarcerated.

**B.  Dismissed Claims.**

In deciding motions to dismiss the amended complaint, the Court dismissed the following claims: the 42 U.S.C. §§1983 and 1985 claims against the defendants in their official capacities, the ADA claims against the defendants in their individual capacities, the conspiracy claims, the breach-of-contract claims, the claims for damages under the Pennsylvania Constitution, the Eighth Amendment claims based solely on allegations of verbal harassment, the equal protection claims against defendants Mummey and Palmigiano, the retaliation claim against defendant Palmigiano, the retaliation claims based on misconducts except as to the retaliatory misconduct claim based on the misconduct issued by defendant Purcell, the Eighth Amendment claim against Vicki and Myron Stanishefski based on lack of mental health treatment, the Eighth Amendment claim against Vicki Stanishefski based on lack of medical treatment after Hammonds allegedly ate tainted food, all due process claims except the due process claim that Hammonds was unable to obtain an impartial hearing, and the intentional infliction of emotional distress claims against the correctional defendants.

### C.   Prior Summary Judgment Motions.

Although the Court dismissed many of Hammonds's claims, many claims survived the motion-to-dismiss stage of the proceedings.   The discovery-stage of the proceedings then began, and after discovery closed, the defendants filed three separate motions for summary judgment.   The court granted in part and denied in part the motion for summary judgment filed by defendants Palmigiano and Mummey: it granted summary judgment to defendant Palmigiano as to all the remaining claims against her, and it granted summary judgment to defendant Mummey as to all remaining claims against him except the retaliation claim.   The Court also granted summary judgment to defendant Li's as to all claims against her. Finally, with respect to the motion for summary judgment filed by the corrections defendants (defendants Collins, Kavolchik, Lorady, Damiter, Sweeney, Keller, Clark, Santarelli, Vicki Stanishefski, Myron Stanishefski, Kuras, Manbeck, Hannon, Purcell, Alshefski, Kramer, Anspach, Moss, Kufro, and Evans), the Court granted that motion with respect to the one remaining due process claim, and it is denied the motion in all other respects without prejudice to the corrections defendants again moving for summary judgment after the completion of discovery, which had been reopened because Hammonds asserted that the was missing necessary documents. Thereafter, discovery continued, and the undersigned conducted conferences and

17

issued numerous orders with respect to discovery.   We gave all parties a full and fair opportunity to conduct discovery.

Currently pending and ripe for consideration is the corrections defendants' renewed motion for summary judgment, the corrections defendants' motion for leave to file another summary judgment motion, and Hammonds's motion for a separate trial as to the remaining claim against defendant Mummey.

## III.   Summary Judgment Motion.

### A.   Summary Judgment Standard.

The defendants moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c).   If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.   Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.   A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.   When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.   The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can

be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

### B.   Material Facts.

The Federal Rules of Civil Procedure and the Local Rules of this Court contain specific provisions addressing how parties should present the facts in support of or in opposition to a summary judgment motion. In that regard,

Fed.R.Civ.P. 56(c)(1) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."   Local Rule 56.1, in turn, provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."   And Rule 56.1 provides that the party opposing a motion for summary judgment shall file a statement of facts in response to the moving party's statement.   Further, Local Rule 56.1 provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party."

The corrections defendants filed a statement of material facts, citing to specific portions of the documents that they filed in support of their motion for summary judgment.   Hammonds responded to the correction defendants' statement

22

of material facts and he has presented three of his own declarations[2] as well as

numerous declarations from other prisoners.[3]

Hammonds cites to his amended complaint in support of some of his

assertions.   Hammonds verified under penalty of perjury that the allegations in his

amended complaint are true and correct. *See Doc. 32* at ¶138.   While a nonmoving

party may not rely on mere allegations in a complaint to create a genuine factual

dispute at the summary-judgment stage, where, as here, the complaint is verified, the

court treats specific, factual allegations in the complaint that are based on personal

knowledge as if they were made in an affidavit or declaration. *See Reese v. Sparks*,

760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit in

---

[2] Actually, Hammonds presented four of his own declarations, but because Hammonds did not sign the fourth declaration, we do not consider that declaration. *See Doc. 297* at 40.   We note, however, in that unsigned declaration, Hammonds complains about corrections staff confiscating his legal documents, which Hammonds contends he needed to respond to the corrections defendants' motion for summary judgment.   We dealt with Hammonds contention concerning his property, *see docs. 292 & 294*, and we are confident that Hammonds had a full and fair opportunity to respond to the motion for summary judgment.

[3] We also do not consider the declaration that Hammonds asserts is from Alferdo Mayo because Mayo did not sign the declaration. *See Doc. 297* at 16-17.   Further, although some of the inmate declarations that Hammonds submitted deal with events that happened to Hammonds, some have little probative value, since they deal with issues and events that happened to those inmates, rather than to Hammonds. Also unhelpful to Hammonds is his reference to a declaration from Clark Weber (found at Document 32 in *Hammonds v. Walsh*, 3:11-CV-01666 (M.D.Pa.)), in which Weber states that Hammonds forced him to draw up a declaration containing false information by threatening to hunt down and murder Weber's family.

23

opposition to a motion for summary judgment); *Boomer v. Lewis*, No.

3:06-CV-0850, 2009 WL 2900778, at *14 (M.D. Pa. Sept. 9, 2009)("A verified

complaint may be treated as an affidavit in support of or in opposition to a motion for

summary judgment if the allegations are specific and based on personal

knowledge.").   Thus, we will consider specific, factual statements that Hammonds

points to in his verified amended complaint that are based on his personal

knowledge.   We will not, however, consider legal conclusions from the amended

complaint or Hammonds's subjective characterizations of events as being

discriminatory or retaliatory.   Further, we only consider the specific, factual

statements from the amended complaint that Hammonds specifically points to in

opposition to the defendants' summary judgment arguments. *Cf. United States v.*

*Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for

truffles buried in briefs.").

Further, in some instances, Hammonds asserts that he does not agree with

facts asserted by the defendants, but he does not cite to record evidence to support

his disagreement.   In those instances, we deem the facts asserted by the defendants

to be unopposed for purposes of this summary judgment motion.   Similarly, in

many instances, Hammonds asserts additional facts in response to facts asserted by

the defendants, but in some of those instances he does not cite to record evidence to

support those additional facts.   In those instances, we do not consider those additional facts.

Rather than set forth a lengthy summary of the material facts here, we set forth the relevant material facts with respect to Hammonds's various claims in connection with the discussion of those claims.

### C.   Eighth Amendment Medical and Mental Health Claims.

Hammonds contends that the defendants denied him medical care and mental health treatment during his confinement at SCI-Frackville.   He also alleges that on one occasion, he asked defendants Alshefski and Kufro to contact the psychological department because he felt suicidal.   Instead of contacting the psychological department, they allegedly told Hammonds to kill himself or they would kill him. Hammonds also alleges that some of the defendants knew of his mental diagnosis and they exploited that information to cause him mental anguish.   Further, he alleges that other defendants tried to persuade defendants Li and Santarelli to perceive Hammonds as less than human by dragging his misconduct history though the record.   But, according to Hammonds, his misconduct history is actually proof of his mental deterioration.   Hammonds alleges that he repeatedly pleaded with the defendants to allow him to go to the mental health clinic at SCI-Waymart.

According to Hammonds, although he is eligible for a mental health program called the SSNU, designed for mentally disabled prisoners, he was excluded from that program because of his disabilities and because of his civil litigation activities.

In order for a plaintiff to establish an Eighth Amendment medical-care claim, he must establish that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *see also Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir. 1995)("Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs."). Serious medical needs include serious mental disorders. *See Brown v. Plata*, 563 U.S. 493 (2011).

A medical need is serious if it "has been diagnosed by a physician as requiring treatment" or if it "is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)(quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd,* 649 F.2d 860 (3d Cir. 1981)(table)). Additionally, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle,* 429 U.S. at

103).   Further, "where denial or delay causes an inmate to suffer a life-long

handicap or permanent loss, the medical need is considered serious." *Id.*

Deliberate indifference is a subjective standard. *Farmer v. Brennan*, 511 U.S.

825, 840 (1994).   "To act with deliberate indifference to serious medical needs is to

recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d

318, 330 (3d Cir. 2009).   To act with deliberate indifference, the prison official

must have known of the substantial risk of serious harm and must have disregarded

that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837.

"[T]he official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference."

*Id.*

The Third Circuit has found deliberate indifference where a prison official:

"(1) knows of a prisoner's need for medical treatment but intentionally refuses to

provide it; (2) delays necessary medical treatment based on a non-medical reason; or

(3) prevents a prisoner from receiving needed or recommended medical treatment."

*Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999).   The Third Circuit has also

held that "[n]eedless suffering resulting from the denial of simple medical care,

which does not serve any penological purpose, . . . violates the Eighth Amendment."

*Atkinson v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003).

At the same time, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002)(claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment).   Instead, deliberate indifference represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse,* 182 F.3d at 197 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).   "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993)(citations omitted).   Courts will "disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." *Spencer v. Courtier*, 552 F. App'x 121, 124 (3d Cir. 2014)(quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).   "Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim." *Caldwell v. Luzerne Cnty. Corr. Facility Mgmt. Employees*, 732 F. Supp. 2d 458, 472 (M.D. Pa. 2010).

28

Expert testimony is required to establish some, but not all, Eighth Amendment medical claims.   "[A] prisoner's claim of deliberate indifference to a serious medical need requires expert testimony when the seriousness of the injury or illness would not be apparent to a lay person." *Heath v. Shannon,* 442 F. App'x. 712, 716 (3d Cir. 2011).   Further, the Third Circuit has "highlighted the inherent challenges that arise from a litigant attempting to provide his/her own explanation of complicated medical symptoms, consequences, and treatment decisions." *Aruanno v. Glazman*, 316 F. App'x 194, 196 (3d Cir. 2009)(citing *Montgomery v. Pinchak,* 294 F.3d 492, 504 (3d Cir. 2002).   "Medical testimony is needed in such cases to assist the factfinder in understanding the case and assessing the quality of medical care received." *Id.*   Also, when an inmate complains that delay in medical treatment violated the Eighth Amendment, he must present medical evidence to establish the detrimental effect of the delay. *Gray v. Wakefield*, 3:09-CV-0979, 2012 WL 4509752, at *7 (M.D. Pa. Sept. 28, 2012).   Further, "[a]bsent an obvious causal relationship between the alleged deliberate indifference and the injuries, the plaintiff must present expert medical testimony." *Id.*

Moreover, a nonmedical prison official is not deliberately indifferent simply because he or she failed to respond to a prisoner's medical complaints when the prisoner was already being treated by a prison doctor. *Durmer v. O'Carroll*, 991

29

F.2d 64, 69 (3d Cir. 1993).   "Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236.

With one exception (defendants Alshefski and Kufro's treatment of Hammonds when he threatened suicide), the corrections defendants are entitled to summary judgment as to the Eighth Amendment claims based on the denial of medical and mental health care.   The undisputed facts show that Hammonds was provided ongoing mental health treatment as well as medical care while he was at SCI-Frackville. *See Doc. 283* at ¶¶106-147, 154-212, 214-225, 228, & 233-255 and *Doc. 296* at ¶¶106-147, 154-212, 214-225, 228, & 233-255.   He was seen by numerous medical professionals as well as psychiatrists and psychologists, and he was prescribed various psychotropic medications at various times. *Id.*   Although Hammonds contends that some of his medical records were altered or fabricated, he has not presented evidence from which a reasonable trier of fact could conclude that this is so.

Further, while Hammonds asserts that more should have been done to treat his mental disorders and the effects of his alleged food poisoning, his disagreement with the care that he received does not support an Eighth Amendment claim.   And what

30

would be appropriate treatment in addition to what was provided is, in this case, beyond the ken of a layperson, but Hammonds has not presented expert testimony regarding that issue.   Moreover, with the exception of defendant Santarelli, who is a Licensed Psychologist Manager, and defendant Kuras, who is a Registered Nurse Manager, the corrections defendants are not medical professionals, and given that Hammonds was receiving ongoing care from medical professionals, they cannot be seen as deliberately indifferent to Hammonds needs.

Similarly, with the exception of defendants Alshefski and Kufro's treatment of Hammonds when he threatened suicide, Hammonds has not presented evidence to support his contention that the corrections defendants knew of his mental diagnosis and they exploited that information to cause him mental anguish.   Moreover, as discussed above, Hammonds received ongoing mental health care.   Further, while Hammonds believes that he should have been transferred to the mental health clinic at SCI-Waymart or to a SSNU and there was discussion among the corrections defendants and the mental health professionals about that, after further consideration and observation of Hammonds, it was decided that such a transfer was not appropriate for Hammonds. *See Doc. 283* at ¶¶117, 127, 131, 135, 137, 141, 143, 158, 162, 164, 166, 171, 186-187, 194, and 200-203 and *Doc. 296* at ¶¶117, 127, 131, 135, 137, 141, 143, 158, 162, 164, 166, 171, 186-187, 194, and 200-203.

Again, while Hammonds disagrees with that conclusion, he has not presented evidence that the defendants refused to allow him to go to such a program knowing that such would cause him a substantial risk of serious harm, such that a reasonable trier of fact could conclude that they were deliberately indifferent to his serious mental health needs.

Hammonds contends that he asked defendants Alshefski and Kufro to contact the psychological department because he felt suicidal, but instead of contacting the psychological department, they told him to kill himself or they would kill him.   He also contends that he seriously considered suicide by tying a sheet around his neck and hanging off his bed, and instead of contacting the psychological department, Alshefski and Kufro walked past his cell several times taunting him.   According to Hammonds, fellow prisoners talked him out of committing suicide.   Alshefski and Kufro assert that they did not suggest to Hammonds that he should commit suicide or that they would kill him, that they did not deny Hammonds access to mental health care anytime he expressed suicidal thoughts, and that, as dictated by DOC policy, they have always contacted the appropriate mental health staff when an inmate expresses suicidal thoughts. *Doc. 284* at 375-376, ¶¶13-15 & 387-388, ¶¶12-14.   But Hammonds has presented evidence to the contrary. *See Doc. 32* (Hammonds's verified amended complaint) at ¶53 (asserting that in response to his

32

request to Alshefski and Kufro to contact the psychological department because he felt suicidal, they said "Kill yourself you fucking retard, or we'll kill you ourselvses."); *Doc 297* at 13 (declaration of Jose Santiago)(stating that he heard Alshefski tell Hammonds to kill himself or he would kill Hammonds himself and stating that Hammonds tied a sheet around his neck, which Alshefski and Kufro saw when they walked past his cell).   Given the evidence presented by Hammonds, there is a genuine factual dispute about whether Hammonds expressed suicidal thoughts and, if he did, what Alshefksi and Kufro did in response.   Those disputes are material because based on Hammonds's evidence, a reasonable factfinder could conclude that at the time Hammonds was suffering from a serious medical need and Alshefski and Kufro were deliberately indifferent to that need.   Accordingly, defendants Alshefski and Kufro are not entitled to summary judgment as to the Eighth Amendment claim regarding this incident.

In sum, the corrections defendants are entitled to summary judgment as to Hammonds's Eighth Amendment claims based on the purported denial of medical care and mental health treatment except that defendants Alshefski and Kufro are not entitled to summary judgment as to the Eighth Amendment claim based on their response to Hammonds's purported threat of suicide.

### D.   Eighth Amendment Food Claims.

Hammonds claims that some of the defendants poisoned his food trays and refused to give him food trays on certain occasions unless he agreed to withdraw grievances that he had submitted.[4]

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).   Unnecessary and wanton inflictions of pain include those that are totally without penological justification. *Hope v. Pelzer*, 536 U.S. 730, 737 (2002). Conditions that inflict needless suffering, whether physical or mental, may constitute cruel and unusual punishment. *Tillery v. Owens*, 719 F.Supp. 1256, 1275 (W.D. Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990).

An Eighth Amendment claim gives rise to a two-prong analysis.   Eighth Amendment claims must satisfy both an objective component (the deprivation must be sufficiently serious) and a subjective component (the defendant must have been

---

[4] Hammonds alleges that on November 11, 2011, officers Long, Wiedow, and Kalce fed him food that had been poisoned, but that purported poisoning was the subject of another of Hammonds's cases (*Hammonds v. Walsh*, 3:11-CV-1666 (M.D.Pa.), Hammonds did not specifically name Long, Wiedow, and Kalce as defendants in this action, and Judge Mariani made clear in his Order of November 30, 2012 that the claim against Long, Wiedow, and Kalce was not part of this action. Accordingly, we do not address that event.

deliberately indifferent). *Young v. Quinlan*, 960 F.2d 351, 359-60 (3d Cir. 1992).

As to the objective component, the Eighth Amendment is violated only when an

inmate is deprived of "the minimal civilized measure of life's necessities." *Rhodes v.*

*Chapman*, 452 U.S. 337, 347 (1981).   As to the subjective component, the question

is whether the prison official acted with deliberate indifference to the inmate's

health or safety. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).   "[A] prison official

may be held liable under the Eighth Amendment for denying humane conditions of

confinement only if he knows that inmates face a substantial risk of serious harm and

disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511

U.S. at 847.

The Eighth Amendment requires that inmates be provided well-balanced

meals containing sufficient nutritional value to preserve health. *Berry v. Brady*, 192

F.3d 504, 507 (5th Cir. 1999).   But "[t]he deprivation of food constitutes cruel and

unusual punishment only if it denies a prisoner the 'minimal civilized measure of

life's necessities.'" *Id.* (quoting *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir.

1998)).   "Whether the deprivation of food falls below this threshold depends on the

amount and duration of the deprivation." *Id.*   The "deprivation of a single meal does

not rise to the level of an Eighth Amendment violation because 'only a substantial

deprivation of food to a prisoner' states a viable Eighth Amendment claim." *Rieco v.*

*Moran*, No. 15-2529, 2015 WL 7730985, at *1 (3d Cir. Dec. 1, 2015)(quoting

*Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir.2009)).

Hammonds contends that on December 23, 2011, defendant Kramer fed him a

bag lunch laced with disinfectant.   Kramer gave Hammonds a bag meal because

Hammonds was placed on restriction because of an incident and a misconduct report

issued to him earlier that morning. *Doc. 283* at ¶75 and *Doc. 296* at ¶75.[5]

According to Hammonds, as per DOC policy, a modified bag meal consists of finger

foods such as raw vegetables, raw fruit, peanut butter and jelly sandwiches, cold

cuts, and powdered milk. *Doc. 296* at ¶75.   Hammonds contends that when Kramer

put the brown paper bag containing the lunch into the aperture on his cell door, the

food busted out of the bag into the aperture, he asked "what's that wet shit," and

Kramer responded that "its rat poison, the same [as] you've been eaten [sic] nigger."

*Id.* at ¶78.[6]   Hammonds refused the meal. *Id.* at ¶79.   According to Hammonds,

---

[5]  According to the defendants, Hammonds refused to turn in his breakfast tray, shouted threats at defendant Purcell, and Purcell issued Hammonds a misconduct report for such.   Hammonds, however, disputes that and contends that Purcell tried to get him to sign off on grievances, which, in order to obtain his breakfast tray Hammonds said he would do, but which he refused to do when the time came to collect the breakfast tray.   We discuss this incident in more detail in connection with Hammonds's retaliation claims.

[6]  While Hammonds points to the video submitted by the defendants, *See Doc. 284*, Exhibit W, which shows events on the morning of December 23, 2011, to support his general recitation of the events, the video, which does not contain sound, does

when Kramer took the bag back, it leaked on the floor, and two prison chaplains later saw the wet residue from the bag on the floor. *Id.* at ¶80 & *Doc. 32* at ¶47.

According to Kramer, the contents of the bag were wet due to heat and due to the moisture of the contents, he did not tell Hammonds that the bag contained rat poison, he did not refer to Hammonds in a derogatory manner, he did not tamper with the food bag or observe anyone tamper with the food bag, and he did not smell disinfectant while handling the bag. *Doc. 283* at ¶76, 78, & 81. But Hammonds asserts that because the bag contained only finger foods, it could not have been wet from condensation. *Doc. 296* at ¶76. And he presented evidence in the form of his verified amended complaint that Kramer told him that he was being fed rat poison.

Accepting Hammonds's version on the events, as we must because he is the nonmoving party, Hammonds has nevertheless failed to present facts from which a reasonable trier of fact could conclude that Kramer denied him the minimal civilized measure of life's necessities. Although Hammonds was deprived of his lunch because of the purported tampering, the denial of one meal does not amount to an Eighth Amendment violation. *Rieco*, 2015 WL 7730985, at *1 (holding that the deprivation of a single meal does not amount to an Eighth Amendment violation). And Hammonds has not presented evidence that Kramer deprived him of any other

not shed light on this incident.

meals.   Further, that Kramer told Hammonds that the bag contained rat poison the same as Hammonds had been eating is not sufficient for a reasonable trier of fact to conclude that Kramer actually served rat poison to Hammonds on other occasions. And while Hammonds contends that he "occasionally" didn't eat and he lost 30 pounds, *see doc. 297* at 20, ¶7, he has not tied his weight loss to the actions of defendant Kramer.   Because Hammonds has failed to show that Kramer tampered with more than a single meal, Kramer is entitled to summary judgment as to the Eighth Amendment denial-of-food claim.

Hammonds asserts that defendant Anspach participated with defendant Kramer in serving him the tainted meal, but Hammonds has not presented any evidence to support that assertion.   Moreover, as stated above, the denial of one meal does not amount to an Eighth Amendment violation.   Accordingly, defendant Anspach is also entitled to summary judgment as to the Eighth Amendment denial-of-food claim.

Hammonds contends that defendants Alshefski and Kufro denied him breakfast and lunch on December 29, 2011, and defendants Keller and Sweeney failed to intervene to correct that denial.   According to the defendants, Alshefski and Kufro did not provide Hammonds with a breakfast tray because Hammonds refused to turn on his cell light and stand at the back of his cell during meal

distribution as required by the rules of the RHU. *Doc. 283* at ¶¶83-85 &87.

Hammonds asserts, however, that he was not provided either breakfast or lunch on

December 29, 2011 because he refused Alshefski's request to sign off on a grievance

he had filed against Alshefski and Hannon. *Doc. 296* at ¶¶86, 87 & ¶92.

Accepting Hammonds's version, his claim nevertheless fails.   The denial of

two meals is not the denial of the minimal civilized measure of life's necessities. *See*

*Zanders v. Ferko,* 439 F. App'x 158, 160 (3d Cir. 2011)(holding that denial of lunch

on one day and the denial of breakfast and lunch the next day does not rise to the

level of a constitutional violation).   Accordingly, defendants Alshefski, Kufro,

Keller, and Sweeney are entitled to summary judgment as to the Eighth Amendment

claim based on denial of food.


### E. Eighth Amendment Conditions-of-Confinement Claims.

Hammonds claims that the conditions to which he was subjected in the RHU

and POC at SCI-Frackville violated the Eighth Amendment.   In a

conditions-of-confinement case, to violate the Eighth Amendment, the prisoner

must be "denied basic human needs, such as food, clothing, shelter, sanitation,

medical care [or] personal safety." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir.

1997).   The focus is on whether the prisoner was deprived of a particular basic

necessity:

> *Some* conditions of confinement may establish an Eighth
> Amendment violation "in combination" when each would not do
> so alone, but only when they have a mutually enforcing effect
> that produces the deprivation of a single, identifiable human
> need such as food, warmth, or exercise—for example, a low cell
> temperature at night combined with a failure to issue blankets.
> To say that some prison conditions may interact in this fashion is
> a far cry from saying that all prison conditions are a seamless
> web for Eighth Amendment purposes.   Nothing so amorphous
> as "overall conditions" can rise to the level of cruel and unusual
> punishment when no specific deprivation of a single human need
> exists.

*Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991)(citations omitted).   The amount of

time a prisoner is subject to a condition is also important: "[T]he length of

confinement cannot be ignored in deciding whether the confinement meets

constitutional standards.   A filthy, overcrowded cell and a diet of "grue" might be

tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*,

437 U.S. 678, 686-87 (1978).

Further, determining whether "conditions of confinement violate the Eighth

Amendment requires more than a scientific and statistical inquiry into the

seriousness of the potential harm and the likelihood that such injury to health will

actually be caused by exposure to" the conditions. *Helling v. McKinney*, 509 U.S.

40

25, 36 (1993). "It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.*

"[O]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *Tsosie v. Dunbar*, 3:CV-10-2104, 2012 WL 1191642, at *8 (M.D. Pa. Apr. 10, 2012), *aff'd,* 504 F.App'x 75 (3d Cir. 2012). The Constitution does not mandate comfortable prisons, *Wilson,* 501 U.S. at 298, and conditions which are not cruel and unusual are not unconstitutional. *Rhodes,* 452 U.S. at 347. "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* Further, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

### 1.   Conditions in the RHU.

Hammonds contends that he was in solitary confinement in the RHU for 23 to 24 hours a day, with no television, no radio, no physical or social contact with

people, no job, no vocational training, no rehabilitative programming, no group meals, no exercise, and no religious services. *Doc. 32* at ¶82.   According to Hammonds, the solitary confinement caused him to deteriorate mentally, emotionally, physically, and spiritually, and placed him at risk of suffering a psychotic breakdown and committing suicide. *Id.* at ¶¶68-69.   Hammonds contends that he spoke to defendant Manbeck "to try to curb the deprivations and retaliations," and Manbeck responded by telling Hammonds that he authorized those deprivations and retaliations, that he would do nothing for Hammonds, that Hammonds is the jailhouse lawyer and he should file a lawsuit, that Hammonds would not be going to "yard, shower, law library, or getting any soap or toilet paper," and that he would beat Hammonds, if Hammonds tests his resolve. *Doc. 32* at ¶58.   Hammonds also contends that on January 6, 2012, he was approved for indigent and legal materials, but defendants Manbeck and Evans denied him such items including soap, toilet paper, shampoo, a writing tablet, and envelopes. *Id.* at ¶59.   And, according to Hammonds, Manbeck stated: "You can't file a lawsuit without your materials." *Id.*

The corrections defendants assert that Hammonds was approved for indigent materials on January 6, 2012, and he received those items on January 11, 2012. *Doc. 283* at ¶100.   They further asseert that Hammonds's adjustment records,

42

which are kept as a record of his daily activities and behaviors in the RHU, indicate that he received all basic necessities, including three meals a day, medication, showers, exercise, and shaves, and the only time when he did not receive basic necessities was when he voluntarily refused or failed to follow policies, which often occurred. *Id.* at ¶¶102-104.   Hammonds asserts, however, that the adjustment records are hearsay, and, in any event, they are false.

There is a genuine factual dispute about whether or when Hammonds received basic items, and that dispute is material to Hammonds's Eighth Amendment conditions claim.   Accordingly, defendants Manbeck and Evans are not entitled to summary judgment as to the Eighth Amendment conditions-of-confinement claim based on the conditions in the RHU.

Hammonds asserts that he wrote to defendants Clark, Lorady, Kavolchik, Damiter, Keller, and Collins seeking redress, but those defendants entered into a code of silence. *See Doc. 32* at ¶60.   Hammonds has not, however, presented evidence of when he wrote to those defendants or what specifically he wrote to those defendants about.   Thus, his contention about writing to those defendants is not enough to show that those defendants were personally involved in depriving him of basic necessities or the conditions in the RHU.   Hammonds also contends that defendants Collins, Kavolchik, and Clark knew of prior deprivations similar to what

43

he had experienced, but they failed to take reasonable measures to abate the practices, which, according to Hammonds, sent a message of approval to their subordinates and led to the campaign of harassment and retaliation against him. *Id.* at ¶64.   But he has failed to present evidence to support that assertion.

Hammonds also contends that he personally spoke to defendants Collins and Damiter on January 19, 2012 about, among other things, being denied basic needs. *Doc. 32* at ¶61.   According to Hammonds, after responding to their question about why he had been transferred there and telling them "staff assaults," defendant Collins told him that it was a slap in their faces that he had not been charged and he said "so now here's yours." *Id.* at ¶62.   Collins allegedly further stated: "You think I care if you['re] being treated inhumanely[.] I believe you spit on Alshefski." *Id.* This is sufficient for a reasonable trier of fact to conclude that on and after January 19, 2012, defendants Collins and Damiter were aware of the conditions in the RHU and that they failed to take action to correct those conditions.   Thus, defendants Collins and Damiter should not be granted summary judgment as to the Eighth Amendment conditions-of-confinement claim to the extent such claim is based on conditions in the RHU on or after January 19, 2012.

### 2. Conditions in the POC.

Hammonds also claims that the conditions in the POC violated the Eighth Amendment.   A POC is "a cell located in the infirmary area of the facility that is used to hold inmates who are mentally decompensating to the point where they are considered a danger to themselves, other inmates, and/or property.   These cells provide a means of retraining the inmate, if necessary, and allow for constant supervision of the inmate to be maintained in order to treat the inmate." *Doc. 283* at ¶148.

The corrections defendants assert that the POC is a cell with no movable fixtures or items, that the POC is cleaned by a janitor when not occupied, that, contrary to Hammonds's allegations, the POC is not polluted with urine, feces, semen, vomit, or old food, and that although inmates in the POC do not have direct access to soap, toilet paper, etc. for safety reasons, the inmates are on constant watch and may notify the observing staff member when such items are needed. *Doc. 283* at ¶¶149-153.   Hammonds, however, has presented evidence to the contrary. According to Hammonds, the POC is dubbed the torture chamber because it has urine, feces, semen, vomit, and old food on the walls, floors, bed, toilet, sink, ceiling, and doors, and prisoners are placed in there with no socks, shoes, and clothes. *Doc.*

*296* at ¶148.[7]   Hammonds further alleges that there is no running water, no working toilet, no soap, no toilet paper, no cleaning supplies, and no food utensils, and if a prisoner speaks out about the lack of necessities, he is deprived of his food tray. *Id.* Based on this evidence, a reasonable trier of fact could conclude that Hammonds was denied the minimal civilized measure of life's necessities—the objective prong of an Eighth Amendment claim—by being confined in the POC on various occasions.

Hammonds's Eighth Amendment claim also has a subjective prong—whether the defendants were deliberately indifferent to his health or safety, but the corrections defendants did not move for summary judgment on that prong. *See Doc. 282* (*Defendants' brief*) at 28 (addressing the Eighth Amendment claim based on Hammonds's confinement in the POC in one paragraph and only addressing what the conditions in the POC actually are).   Accordingly, we do not address that prong.

We are nevertheless left to ponder against which defendants specifically this claim is made.   Hammonds's amended complaint does not shed light on this, and

---

[7] In addition to relying on his verified amended complaint to support these assertions, Hammonds relies on the declaration of Inmate Alfonso Percy Pew, who asserts that he was confined at SCI-Frackville from February of 2012 to October of 2012 and that he was janitor of the POC cell area. *See Doc. 297* at 11-12.   But since Pew's declaration concerns events and conditions occurring, at the earliest, in February of 2012, which appears to be after the time that Hammonds was in the POC, we do not consider his declaration.

neither do the briefs of the parties.   As set forth above, Hammonds does asserts that

he personally spoke to defendants Collins and Damiter on January 19, 2012 about,

among other things, being denied basic needs. *Doc. 32* at ¶61.   Given this assertion,

defendants Collins and Damiter should not be granted summary judgment as to the

Eighth Amendment conditions-of-confinement claim to the extent such claim is

based on conditions in the POC on or after January 19, 2012.

### F.   Eighth Amendment Excessive Force Claim.

Hammonds claims that defendants Purcell, Kramer, Anspach, and Moss used

excessive physical force against him when they closed the slot in his cell door on his

hand causing him excruciating pain and resulting in a permanent scar and

dysfunction of his left hand.

The Eighth Amendment prohibits cruel and unusual punishment, and

whenever prison officials are accused of using excessive force in violation of the

Eighth Amendment the inquiry "is whether force was applied in a good-faith effort

to maintain or restore discipline, or maliciously and sadistically to cause harm."

*Hudson v. McMillian*, 503 U.S. 1, 7 (1992).   The following factors are relevant in

determining if the force use violated the Eighth Amendment: the extent of the injury

suffered; the need for the application of the force; the relationship between that need

and the amount of force used; the threat reasonably perceived by the official; and any efforts made to temper the severity of a forceful response. *Id.*   The reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396–97 (1989).

Not "every malevolent touch by a prison guard" violates the Constitution. *Hudson,* 503 U.S. at 9.   "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* (quoting *Whitley,* 475 U.S. at 327). Thus, "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).   The extent of injury suffered is a consideration that may be relevant to determining if the force could have plausibly been thought necessary. *Id.* at 37.   "The extent of injury may also provide some indication of the amount of force applied." *Id.*   But to establish an excessive force claim, an inmate does not need to show that he suffered a significant, or even a more than *de minimis*, injury.

*Id*.   Rather, the central issue is the force used by the officer, not the injury caused by the officer. *Flood v. Schaefer*, 439 F. App'x 179, 182 (3d Cir. 2011).

Both Hammonds and the defendants direct the Court to a video of the incident.   The video shows an officer taking some clothes from Hammonds through the box sticking out from the aperture on Hammonds's cell door, Hammonds sticking his hands out of the aperture in his cell door into the attached box,[8] and the officer walking away. *See Doc. 284, Exhibit W* (video starting at approximately 9:34:15 a.m.).   The officer, along with another officer, returns to Hammonds's cell a short time later and has a discussion with Hammonds, and then a third officer joins the others. *Id.*   The first officer walks away again and after a very brief time, returns to the cell door, where he takes Hammonds's jumpsuit from the box and he attempts to take another article of clothing from the box, but Hammonds pulls on that article of clothing. *Id.*   Then the officers very quickly close the lid to the box on the cell door, with one of the officers pushing down on the lid. *Id.*   Approximately twenty seconds later, the officers appear to adjust the lid, and then they walk away. *Id.*   The quality of the video, like many prison videos, is not great, and it is difficult to see some of the details of what happened.   While the video shows the officers closing the lid, it is difficult to see Hammonds's hands at the time.

---

[8] The parties sometimes refer to this device as a wicket.

There are genuine factual disputes about what exactly happened during this incident.   The defendants contend that Purcell ordered Hammonds to comply with strip-search procedures in advance of a medical appointment, that Purcell did not threaten Hammonds or use derogatory language, that Hammonds removed most of his clothing but refused to remove his underwear, and that after Purcell again requested that he comply, Hammonds refused and placed his hands outside the feeding aperture. *Doc. 283* at ¶¶ 56-61.   Then, according to the defendants, Kramer and Anspach went to the cell, Purcell attempted to remove clothing from the aperture, Hammonds lunged his hands outside the aperture in an aggressive manner, and Kramer and Anspach closed and secured the plexiglass wicket lid in an effort to prevent an assault. *Id.* at ¶¶62-64.   The defendants contend that Moss did not order Purcell or Kramer to shut the lid on Hammonds's hand. *Id.*at ¶67.   The defendants further contend that when Kramer realized that Hammonds's hand was under the lid after it was secured, he informed Hammonds that he would unlatch the lid, he ordered Hammonds to remove his arm, and Hammonds's hand was removed from under the lid quickly. *Id.* at ¶¶65 & 68.   Medical staff was notified within minutes of the incident, and medical staff examined Hammonds within a half hour after the incident noting no injury to Hammonds's hand. *Id.* at ¶¶69-70.

Hammonds, on the other hand, tells a different story.   He contends that Purcell approached his cell and said: "Strip down you faggot snitch, you have a medical appointment." *Doc. 32* (verified amended complaint) at ¶42.   According to Hammonds, he complied with the order, but he requested the presence of a lieutenant or a camera to record the escort and he stuck his hands outside the slot in a nonthreatening manner after Purcell told him: "When we get you to medical, we're going to beat your nigger ass." *Id.*   After Purcell walked off, Kramer and Anspach then allegedly said: "We're going to teach your nigger ass a lesson for snitching on our colleagues." *Id.* at ¶43.   According to Hammonds, defendant Moss shouted: "We can't leave that slot open[.]   Close his fucking hand in their [sic]." *Id.* Hammonds contends that Purcell then returned to his cell, snatched his clothes from the aperture, and Kramer closed the lid of the compartment causing him excruciating pain, leaving a permanent scar, and causing dysfunction of his hand. *Id.*   According to Hammonds, Kramer told him "this is only the beginning you rat bastard." *Id.*

Here, based on the facts set forth by Hammonds, a reasonable trier of fact could conclude that the defendants' use of force violated the Eighth Amendment. A factfinder may well agree with the defendants' contentions that closing the wicket on Hammonds's hand was the type of *de minimis* use of force that falls outside the scope of the Eighth Amendment.   But given that we must construe the evidence in

the light most favorable to Hammonds as the nonmoving party and given the lack of

clarity of the video, we cannot say as a matter of law that the force used was *de*

*minimis*.   Further, given the dispute about exactly what happened, i.e., did

Hammonds aggressively lunge at the officers or merely keep his hands outside the

aperture in an attempt to get the officers to summon a lieutenant, and in light of what

Hammonds asserts the officers said during the incident, it is for the factfinder to

determine whether the force was a good-faith effort to restore discipline or whether

the officers maliciously and sadistically used force in an effort to harm Hammonds

because they did not like that he snitched on other officers.   Accordingly,

defendants Purcell, Kramer, Anspach, and Moss are not entitled to summary

judgment as to the Eighth Amendment use-of-force claim.


### G. Retaliation Claims.

Hammonds contends that the corrections defendants retaliated against him for

his legal activities in a myriad of ways.

"Retaliating against a prisoner for the exercise of his constitutional rights is

unconstitutional." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012).   Retaliation

claims are judged against exacting legal standards.   A prisoner claiming that a

defendant retaliated against him for exercising his constitutional rights must prove

that: (1) his conduct was constitutionally protected; (2) he suffered "adverse action" at the hands of the defendant; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision of the defendant. *Carter v. McGrady,* 292 F.3d 152, 158 (3d Cir. 2002).   "Once a prisoner has made his *prima facie* case, the burden shifts to the defendant to prove by a preponderance of the evidence that [he or she] 'would have made the same decision absent the protected conduct for reasons reasonably related to penological interest.'" *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3rd Cir. 2001)).

Hammonds claims that the defendants retaliated against him because he filed lawsuits and grievances.   The filing of lawsuits and prison grievances is constitutionally protected activity. *Fantone v. Latini*, 780 F.3d 184, 192 n.8 (3d Cir. 2015)(noting that "[]the filing of a prison grievance is an activity protected by the First Amendment."); *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir. 2003)(holding that prisoner's allegation that he was falsely charged with misconduct in retaliation for filing complaints against officer implicates conduct protected by the First Amendment).   Thus, Hammonds satisfies the first element of a retaliation claim. We address below whether he meets the other elements in connection with the discussion of his particular retaliation claims.

### 1.   Denial of Transfer to a SAU.

On September 29, 2011, Hammonds attended a PRC meeting. *Doc. 283* at ¶28 and *Doc. 296* at ¶28.   The PRC is a committee consisting of three staff members who conduct Administrative Custody Hearings, conduct periodic reviews, make decisions regarding continued confinement in the RHU and/or Special Management Unit (SMU), and hear all first level appeals of misconducts. *Id.* at ¶29.   Per policy, the committee consists of one staff member from each of the following staff classifications: Deputy Superintendent, who shall serve as the chairperson; Corrections Classification Program Manager, Unit Manager, School Principle, Drug and Alcohol Treatment Specialist Supervisor, or Inmate Records Officer Supervisor; and a Commissioned Officer. *Id.*   The Facility Manager may designate other staff as committee members. *Id.*   Whenever a PRC is convened, at least one member of the committee must be a staff member who is not directly involved in the administration of the RHU/SMU in which the inmate is currently housed. *Id.*

On September 29, 2011, defendants Collins, Kovalchik, Sweeney, and Santerelli as well as Unit Manager Scheruren attended the PRC meeting. *Doc. 283* at ¶28 and *Doc. 296* at ¶28.   According the defendants, at the PRC meeting, Hammonds demanded to be placed in the SMU. *Doc. 283* at ¶30.   The SMU is a "special unit within the designated Department facilities designed to safely and

humanely handle an inmate whose behavior presents a serious threat to the safety and security of the facility, staff, other inmates or himself/herself." *Doc. 283* at ¶31 and *Doc. 296* at ¶31.   The defendants contend that the PRC noted that Hammonds had racked up disciplinary time until 2016, the PRC advised Hammonds that he needed a substantial period of positive adjustment in the RHU before it would consider placement in the SMU, and the PRC informed Hammonds that he needed to cooperate with RHU staff. *Doc. 283* at ¶32.   At which point, according to the defendants, Hammonds became argumentative, said that he would obtain a court order for SMU placement, and said that he did not intend to follow the RHU's policies and procedures. *Id.* at ¶33.

Hammonds disputes that he demanded to be placed in the SMU; rather, he asserts that he was seeking placement in the SAU for an evaluation given that his mental condition was deteriorating. *Doc. 296* at ¶30 and *Doc. 32* at ¶27.   More specifically, he asserts that, at his request, defendant Santerelli was at the PRC meeting seeking approval to send Hammonds to the SAU. *Doc. 32* at ¶27. Hammonds also asserts that at the meeting, defendant Kavolchik reprimanded him for filing lawsuits and grievances, and Kovolchik threatened him with indefinite lockdown stating "I'm going to make sure you never go get your evaluation until your behavior changes[;] until then you will remain in the (RHU) forever." *Doc. 296*

55

at ¶¶30 & 36-37 and *Doc. 32* at ¶¶26 & 28.   According to Hammonds, Kovalchik told Santarelli to never inquire again "about this fucking retard." *Doc. 32* at ¶28. Further, Hammonds contends that after Kovalchik said that he was assaultive toward staff and uncooperative, Santarelli interjected that he has mental impairments —including post-traumatic stress disorder, manic depression, depression, and anti-social personality disorder—that make him incapable of controlling his behavior, and Kovalchik then ended the meeting. *Id.*

The defendants do not contest for purposes of their summary judgment motion that Hammonds can meet the second—adverse action—element of a retaliation claim here.   Instead, they contend that he cannot meet the third element. They assert that Hammonds has not pleaded facts to establish that the decision not to send him to a specialized unit was unrelated to a legitimate penological justification and that evidence shows that it was, i.e., Hammonds needed to demonstrate a substantial period of positive adjustment in the RHU prior to being considered for SMU placement. *See Doc. 282* at 10.   While the defendants contend that Hammonds cannot meet the third element, they appear to confuse that element—the causation element—which is Hammonds's burden to establish, with their affirmative defense—that they "'would have made the same decision absent the protected conduct for reasons reasonably related to penological interest'"—which

they have the burden "to prove by a preponderance of the evidence." *Carter,* 292

F.3d at 158 (quoting *Rauser*, 241 F.3d at 334).   Nevertheless, given that Hammonds

has presented evidence that Kovalchik reprimanded him for filing lawsuits and

grievances before telling him that he would not be evaluated for the SAU until his

behavior changes, a reasonable trier of fact could conclude that Hammonds's filing

of grievances and lawsuits was a substantial or motivating factor in the decision not

to consider him for SAU placement at the time.   Thus, Hammonds has presented

sufficient evidence of causation to survive summary judgment.

    Further, to the extent the defendants are seeking summary judgment as to their

affirmative defense, i.e., that they would have taken that same action despite

Hammond's protected conduct, they have failed to establish that they are entitled to

summary judgment.   A party that moves for summary judgment on an issue for

which he or she bears the ultimate burden of proof faces a difficult road. *United

States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011).   "[I]t is inappropriate to grant

summary judgment in favor of a moving party who bears the burden of proof at trial

unless a reasonable juror would be compelled to find its way on the facts needed to

rule in its favor on the law." *El v. Se. Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir.

2007) (footnote omitted).   A party who has the burden of proof must persuade the

factfinder that his propositions of fact are true, and "if there is a chance that a

reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *Id*.   "Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will." *Id.*   Here, given the dispute about what was said at the PRC meeting, the defendants have not meet their burden of establishing that a reasonable juror would be compelled to find their way on the facts.   Accordingly, the defendants are not entitled to summary judgment as to this retaliation claim.

Further, given that the defendants assert that the decision not to send Hammonds to a SAU was not Kovalchik's alone, but rather the entire group determined that specialized placement was not appropriate, *see doc. 282* at 11, this retaliation claim remains against defendants Collins, Kovalchik, and Sweeney.[9]

## 2. Vicki Stanishefski's Failure to Investigate.

Hammonds contends that defendant Vicki Stanishefski retaliated against him by failing to properly investigate the grievances that he filed regarding defendants

---

[9]   Although defendant Santarelli was also present at this PRC meeting, given Hammonds's assertions that Santarelli advocated on his behalf in favor of sending him to the SAU, there is no basis to infer that Santerelli retaliated against Hammonds.

Palmigiano and Mummey's alleged failure to provide him with proper medical treatment in November of 2011 after Hammonds complained of being poisoned.

Hammonds filed two grievances, one dated November 11, 2011, and one dated November 12, 2011, which were combined into one grievance. *See Doc. 284* at 342.   Vicki Stanishefski partially granted and partially denied the grievance. *Doc. 283* at ¶230 and *Doc. 296* at ¶230.   She noted that based on Hammonds's medical records and inmate account, since his arrival at SCI-Frackville, he had signed up for sick call eight times for multiple health complaints. *Id.*   She noted that he refused sick call visits twice and that twice the sick call visits were terminated due to his verbal hostility toward the health care provider. *Id.*   She further noted that Hammonds's records indicated that he was at times medication non-compliant and refused laboratory and tuberculosis testing. *Id.*   She stated that multiple health care providers provided Hammonds with detailed health education related to his treatment plan as well as the definition of a chronic condition. *Id.*   Lastly, she reviewed his inmate account and copay information, stating that he would be refunded $5.00. *Id.*   Although defendant Collins upheld Stanishefski's response on appeal, the grievance was later remanded by the Secretary's Office of Inmate Grievances & Appeals (SOIGA) because Stanishefski only addressed one of the two grievances that had been consolidated. *Id.* at ¶232 and *Doc. 284* at 341-342.

59

According to Hammonds, once the grievance was remanded to Stanishefski, she began to "doctor" his medical records and instructed others to do the same, but he has failed to present evidence to support that assertion.   And, contrary to Hammonds's suggestion, the fact that SOIGA remanded the grievance for further review does not support a reasonable inference that Stanishefski was retaliating against Hammonds for his legal activities.   In sum, Hammonds has failed to point to evidence that his legal activities were a substantial or motivating factor in how Stanishefski responded to his grievances.   Accordingly, Vicki Stanishefski is entitled to summary judgment as to this claim, and so is Myron Stanishefski, as Hammonds has not pointed to any evidence that he was involved in any retaliation.

### 3.   Doctoring of Medical Records.

Hammonds claims that defendants Kuras and Vicki Stanishefski doctored his medical records in retaliation for his legal activities.   As support for that assertion, he cites to an entry in his medical records from October 14, 2011, which provides: "Patient c̄ elevated Bilirubin. Refer to Dr. Li—could it be 2° Remeron?" *Doc. 284* at 540.   Although is not clear who authored this note, the name written in the medical records does not appear to be Vicki Stanishefski or Mary Alice Kuras.   And Hammonds has failed to present facts from which it can reasonably be inferred that

60

Stanishefski or Kuras (or anyone else) doctored that entry in Hammonds's medical records (or any other entry).   Accordingly, the defendants are entitled to summary judgment as to the retaliation claim based on doctoring of medical records.

### 4.   Defendant Hannon.

Hammonds contends that, on December 18, 2011, defendant Hannon came to his cell door and called him derogatory names—"homosexual dick sucking fucking bitch snitch"—and threatened to assault him if he did not stop exercising his right to petition. *Doc. 32* at ¶35.   According to Hammonds, Hannon also told other prisoners about his misconduct history from other jails, and prisoners then called him sexually derogatory names. *Id.* at ¶36.   Hammonds further contends that Hannon stopped at his cell door again, used sexually derogatory language, and said "that's for being a snitch." *Id.*

Defendant Hannon contends that Hammonds has failed to establish that he was subject to an adverse action because he has established nothing more than verbal harassment and such does not amount to a constitutional violation.[10]   In the context of a retaliation claim, an adverse action is an action sufficient to deter a person of

---

[10]  Hannon contends that the Court previously dismissed Hammonds's verbal harassment claim.   While the Court did dismiss Hammonds's Eighth Amendment claims based solely on allegations of verbal harassment, *see doc. 95* at 4, it did not dismiss Hammonds's retaliation claim based on these events, *see id.* at 3.

ordinary firmness from exercising his or her constitutional rights. *Rauser,* 241 F.3d at 333.   While mere verbal harassment may not constitute an adverse action, here Hammonds contends more than just verbal harassment.   He contends that Hannon threatened to assault him and called him a snitch in front of other prisoners.   It is not clearly established whether threats alone can amount to adverse action. *See Wilson v. Zielke,* 382 F. App'x 151, 153 (3d Cir. 2010) ("Some of our sister circuits have held that verbal threats alone can support a claim for retaliation. . . . However, neither the United States Supreme Court nor this Circuit has defined with specificity the contours of when a threat constitutes an adverse action in the official-detainee setting").   Courts in this Circuit, however, generally conclude that mere threats do not amount to adverse action. *See e.g. Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012)(holding that "verbal threats and few gestures of racial harassment Dunbar allegedly encountered are not sufficiently adverse to support a retaliation claim under the circumstances of this case"); *Burgos v. Canino,* 358 F. App'x 302, 306 (3d Cir. 2009) ("[T]hreats alone do not constitute retaliation."); *Sanders v. Derose*, No. 1:14-CV-00288, 2015 WL 5895492, at *4 (M.D. Pa. Sept. 30, 2015)("Courts in this circuit have consistently held that verbal threats do not constitute 'adverse action' for the purpose of a retaliation claim.").   But here we have more than just a threat and general naming calling.   According to Hammonds, Hannon called him a snitch

and exposed his misconduct history to other prisoners.   Courts have recognized the danger to a prisoner of being called a snitch. *Tabb v. Hannah*, No. 10-1122, 2012 WL 3113856, at *11 (M.D. Pa. July 30, 2012)("'[B]eing branded a 'snitch' may have serious consequences to an inmate's health.'").   And labelling a prisoner a snitch may amount to an adverse action. *See generally Rivera v. Marcoantonio,* 153 F. App'x 857, 859 (3d Cir. 2005)(concluding that "[t]he facts alleged relating to Williams' actions, including verbal abuse, encouraging other residents to take action against the 'snitch,' and refusal to unlock Rivera's door, if proven, would rise to the level of "'adverse action'"); *Miller v. Trometter,* No. 4:11-CV-811, 2012 WL 5933015, at *7 (M.D.Pa. Nov. 27, 2012) (holding that "a corrections officer's verbal abuse of an inmate and his encouragement of other residents to take action against the "snitch" may establish adverse action).   Whether a person of ordinary firmness would be deterred is a question of fact. *Brooks v. Smith*, No. 3:CV-04-2680, 2007 WL 3275266, at *10 (M.D. Pa. Nov. 6, 2007).   A reasonable factfinder could conclude that defendant Hannon's actions would deter a person of ordinary firmness from exercising his rights.   Thus, Hammonds has presented enough to survive summary judgment as to the question of adverse action.

Defendant Hannon also contends that any purported adverse action was not causally related to Hammonds's filing of a complaint or grievance.   But given that

Hammonds asserts that Hannon said "that's for being a snitch," a reasonable trier of facts could conclude that Hammonds's protected conduct was a substantial or motivating factor in Hannon's actions.   Accordingly, Hannon is not entitled to summary judgment as to the retaliation claim against him.

### 5.   December 23, 2011 Misconduct.

On the morning of December 23, 2011, defendant Purcell issued Hammonds a misconduct report for refusing to obey an order, using abusive, obscene, or inappropriate language, and threatening an employee with bodily harm. *See Doc. 284* at 244.   According to Purcell, while he was collecting meal trays, Hammonds failed to turn on the light in his cell after being ordered to do so, he used obscenities, and he made threats. *Id.*   According to Hammonds, however, while defendants Kramer and Anspach were passing out breakfast trays, Purcell called him a "fucking snitch" in reference to a recent hearing on a motion for a temporary restraining order in one of his cases, and Purcell told Kramer not to give him a tray because he is a snitch. *Doc. 32* at ¶39.   Hammonds contends that Kramer said "again who'd he snitch on now," and Purcell said "Alshefski, Mariachi, and Hannon." *Id.*   Purcell then, according to Hammonds, told him to sign off on certain grievances and he would be given a meal, and Hammonds agreed just to get his breakfast. *Id.*   But

when it was time for the defendants to collect the breakfast trays, Hammonds

refused to sign off on the grievances, and Purcell told Kramer and Anspach not to

collect his tray until he signs off on the grievance and his §1983 action. *Id.* at ¶ 40.

When Hammonds said that they could collect his tray, Anspach ignored him and

Kramer said "Man I don't know." *Id.*   Hammonds contends that a short time later,

Purcell collected his breakfast tray, said "enjoy your food loaf bitch," and issued the

misconduct report. *Id.* at ¶ 41.

Defendant Purcell does not contest that the misconduct report, which led to

disciplinary custody time for Hammonds, was an adverse action sufficient to satisfy

the second element of a retaliation claim.   He also does not claim that Hammonds

cannot establish that his constitutionally protected conduct was a substantial or

motivating factor in the decision to issue the misconduct, and given Purcell's

statements asking Hammonds to sign off on grievances, a reasonable trier of fact

could conclude that there was a causal connection.   But Purcell contends that

because Hammonds was found guilty of the misconduct charges, he has meet his

burden of showing that the charges would have been brought even if Hammonds had

not filed a grievance.

"[O]nce a prisoner demonstrates that his exercise of a constitutional right was

a substantial or motivating factor in the challenged decision, the prison officials may

still prevail by proving that they would have made the same decision absent the

protected conduct for reasons reasonably related to a legitimate penological

interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).   In *Carter v. McGrady*,

292 F.3d 152, 159 (3d Cir. 2002), the United States Court of Appeals for the Third

Circuit affirmed the grant of summary judgment to prison officials on claims that the

officials took disciplinary actions against the prisoner for his legal activities.   In

*Carter,* based on the "sizeable quantum" of evidence of misconduct on the part of

the prisoner, the court concluded that, even if the prison officials were motivated by

animus to jailhouse lawyers, the prisoner's offenses "were so clear and overt" such

that there was no genuine issue of material fact that the officials' actions were

reasonably related to legitimate penological interests and the prisoner "would have

been disciplined notwithstanding his jailhouse lawyering." *Id.* at 158-59.   The court

described the "sizeable quantum" of evidence of misconduct against the prisoner:

> In this case, Carter was never charged with misconduct for
> helping other inmates with legal matters or having their legal
> materials in his cell.   Rather, he was charged with misconduct
> for undisputed violations of prison policy.   The search and
> seizure of items from his cell were related to these various
> violations.   Carter was discovered with a stolen typewriter in his
> cell.   The cell search uncovered an envelope containing two
> receipts for the typewriter, identical to the sales receipt and credit
> card sales slip faxed by the vendor.   As a result, Carter was
> disciplined with sixty days in the RHU.

Moreover, it is not disputed that Carter corresponded with Unger in violation of prison policy.   Carter conceded that he wrote a note to Unger without seeking authorization for that correspondence.   His cell was searched in connection with this allegation; he was written up and subsequently disciplined with thirty days for this conduct.   Additionally, there is no dispute that the amount of property kept by Richard Carter and Dana Carter in their cell exceeded the amount allowed by fire and safety regulations.   The materials were seized for this reason, and Carter was allowed to select up to two boxes of his personal material to keep in his cell.   Finally, in the course of searching Carter's cell in connection with the unauthorized use of the mails, prison officials found the newsletter, "The Last Line of Defense," a publication of which Carter was the editor and for which he had not requested or obtained approval by the SCI–Mahanoy administration.   The foregoing represents a sizeable quantum of misconduct evidence.

*Id*. at 158.

The defendants cite an Eighth Circuit decision—*Henderson v. Baird,* 29 F.3d 464, 469 (8th Cir. 1994)—for the proposition that retaliatory-disciplinary claims fail when there is some evidence supporting a guilty finding on the misconduct charge. In unpublished decisions, the Third Circuit has relied on *Henderson* for that proposition. *See e.g. Nifas v. Beard,* 374 F.App'x 241 (3d Cir. 2010).   In *Nifas,* the Third Circuit held that "Nifas's retaliatory discipline claim fails because there is 'some evidence' supporting the guilty findings for the three disciplinary charges brought against Nifas after he filed his grievance in October 2006." *Id.* at 244.   In *Nifas,* the Third Circuit cited the Eighth Circuit's decision in *Henderson*, which held

that a finding based on "some evidence" that the prisoner committed the misconduct charged essentially "checkmates" a prisoner's retaliation claim. *Id.   See also Romansky v. Stickman*, 147 F. App'x 310, 312 (3d Cir. 2005)(citing *Henderson* and concluding that "a finding that a prisoner violated the rules checkmates his retaliation claim").

We are bound, however, by the Third Circuit's published opinions, not its unpublished opinions.   Thus, we must follow *Carter* rather than *Nifas* and other unpublished decisions.   "[I]n *Carter,* the controlling precedential case in this circuit, the Court of Appeals granted summary judgment for the defense based on the "quantum of evidence" in the record concerning the plaintiff's misconduct, not the mere fact that the prisoner had been found guilty of the misconduct." *Mincy v. McConnell*, 1:09-CV-236-SJM-SPB, 2012 WL 1436562, at *2 (W.D. Pa. Apr. 25, 2012)(quoting *Carter,* 292 F.3d at 152).   "*Carter* should not be read as establishing a per se bar against retaliation claims in every instance where a prisoner is found guilty of an allegedly false misconduct charge." *Id.*[11]

---

[11]  We note that the "some evidence" standard is borrowed from a due process case. *See Superintendent v. Hill*, 472 U.S. 445, 455 (1985)(holding that due process requires that there be some evidence to support the findings of the disciplinary hearing officer).   In other contexts, the Third Circuit has distinguished due process claims from retaliation claims. *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000)(holding that *Sandin v. Conner,* 515 U.S. 472 (1995), does not preclude a

Here, Hammonds has presented evidence that creates a genuine factual

dispute about what happened on December 23, 2011 leading up to the misconduct

report.   Unlike in *Carter*, there is not a "sizeable quantity" of undisputed evidence

of misconduct such that we can say as a matter of law that Purcell would have issued

the misconduct notwithstanding Hammonds's protected conduct.   While a

reasonable trier of fact may well conclude that there was sufficient evidence to

support the misconduct report and that Purcell issued the misconduct report because

of misconduct by Hammonds, at the summary judgment stage, where we must

construe the evidence in the light most favorable to Hammonds, on this record, we

cannot draw that conclusion as a matter of law.   Rather, we are constrained to

conclude that a reasonable trier of fact who found Hammonds's evidence credible

---

claim that the prisoner was kept in administrative segregation in retaliation for filing
civil-rights actions against prison officials because retaliation may be actionable
even when the retaliatory action does not involve a liberty interest); *Rauser v. Horn*,
241 F.3d 330, 333 (3d Cir. 2001)("We hold that the relevant question is not whether
Rauser had a protected liberty interest in the privileges he was denied, but whether
he was denied those privileges in retaliation for exercising a constitutional right.");
*Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002)(noting, in the context of a
claim by a prisoner that an officer issued a false misconduct report in retaliation for
the prisoner's conduct toward the officer and to cover up a beating, that it had
"previously held that falsifying misconduct reports in retaliation for an inmate's
resort to legal process is a violation of the First Amendment guarantee of access to
the courts," but concluding that Smith did not "claim that another constitutional right
(such as access to the courts) was violated" and therefore his due process claim
based on the falsified misconduct failed).

could find that Purcell would not have issued the misconduct report had Hammonds not filed grievances.   Accordingly, defendant Purcell is not entitled to summary judgment as to the retaliation claim based on the misconduct report.

### 6. Use of Force.

As discussed in connection with the Eighth Amendment, Hammonds claims that defendants Purcell, Kramer, Anspach, and Moss used excessive physical force against him when they closed the slot in his cell door on his hand.   Although the defendants dispute Hammonds's version of what happened, because Hammonds is the nonmoving party, we accept his version in connection with the summary judgment motion.   A reasonable trier of fact could conclude that closing the slot on the wicket of a cell door on an inmate's hand would be sufficient to deter a person of ordinary firmness from exercising his rights.   Further, given that Hammonds contends that the defendants called him a snitch and a rat bastard and said that they were going to teach him a lesson for snitching on their colleagues, a reasonable trier of fact could conclude that Hammonds's protected conduct was a substantial or motivating factor in the decision to use force.   Accordingly, defendants Purcell,

Kramer, Anspach, and Moss are not entitled to summary judgment as to the retaliation claim based on the use of force.[12]

### 7.   Denial of Food.

As discussed above in connection with the Eighth Amendment, Hammonds contends that on December 23, 2011, defendant Kramer fed him a bag lunch laced with disinfectant.   Defendant Kramer contends that he is entitled to summary judgment as to the retaliation claim based on this incident because, in contravention to Hammonds's assertion, he did not tamper with the lunch and he did not tell Hammonds that the bag contained rat poison.   Again, we must accept Hammonds's version of the events because he is nonmoving party.   Based on Hammonds's version of the events, defendant Kramer is not entitled to summary judgment as to the retaliation claim based on tampering with Hammonds's food.   As determined in connection with the Eighth Amendment claim, however, Hammonds has not

---

12 Although Purcell issued Hammonds a misconduct following the use-of-force incident and the defendants have moved for summary judgment as to the retaliation claim based on that misconduct, we conclude that the retaliation claim based on that misconduct did not survive the motion to dismiss because Judge Mariani dismissed all allegations of misconducts issued as retaliation except the retaliation claim with respect to the misconduct issued by Purcell, and the only misconduct addressed in a nonconclusory way in the amended complaint was the misconduct that Purcell issued following the earlier incident regarding the collection of breakfast trays, which we have already discussed. *See Doc. 95* at 3.

presented any evidence to support an inference that Anspach was personally involved in the alleged food tampering.   Accordingly, defendant Anspach is entitled to summary judgment as to the retaliation claim.

Further, as discussed in connection with the Eighth Amendment, Hammonds also contends that defendants Alshefski and Kufro denied him breakfast and lunch on December 29, 2011, because he refused Alshefski's request to sign off on a grievance he had filed and defendants Keller and Sweeney failed to intervene to correct that denial.   Again, the defendants dispute Hammonds's version of what happened, but because Hammonds is the nonmoving party we must accept his version for purposes of summary judgment.   Accepting Hammonds's version, a reasonable trier of fact could conclude that the defendants retaliated against Hammonds because of his protected conduct.   Thus, defendants Alshefski, Kufro, Keller, and Sweeney are not entitled to summary judgment as to the retaliation claim.

### 8.  Suicide Threat.

As discussed in connection with the Eighth Amendment, Hammonds contends that he asked defendants Alshefski and Kufro to contact the psychological department because he felt suicidal, but instead of contacting the psychological

department, they told him to kill himself or they would kill him.   He also contends that he seriously considered suicide by tying a sheet around his neck and hanging off his bed, and instead of contacting the psychological department, Alshefski and Kufro walked past his cell several times taunting him.   According to Hammonds fellow prisoners talked him out of committing suicide.   Alshefski and Kufro dispute Hammonds's version of what happened, *Doc. 284* at 375-376, ¶¶13-15 & 387-388, ¶¶12-14.   But Hammonds has presented evidence to support his version. *See Doc. 32* (Hammonds's verified amended complaint) at ¶53 (asserting that in response to his request to Alshefski and Kufro to contact the psychological department because he felt suicidal, they said "Kill yourself you fucking retard, or we'll kill you ourselvses."); *Doc 297* at 13 (declaration of Jose Santiago)(stating that he heard Alshefski tell Hammonds to kill himself of he would kill Hammonds himself and stating that Hammonds tied a sheet around his neck, which Alshefski and Kufro saw when they walked past his cell).   Given the evidence presented by Hammonds, there is a genuine factual dispute about whether Hammonds expressed suicidal thoughts and if he did, what Alshefksi and Kufro did in response.   Further, this incident occurred after Alshefski and Kufro refused to provide him either breakfast or lunch purportedly because Hammonds refused Alshefski's request to sign off on a grievance he had filed.   And Hammonds contends that Alshefski and Kufro said

"that's what Happens to niggers who cause's [sic] problems with me and my colleagues, sign off [on] these grievances and everything will cease." *Doc. 32* at ¶52. Based on Hammonds's evidence, a reasonable trier of fact could conclude that Alshefski and Kufro failed to contact the psychological department after Hammonds threatened suicide because of Hammonds's grievance.   Accordingly, defendants Alshefski and Kufro are not entitled to summary judgment as to the retaliation claim regarding this incident.

### 9.   Deprivations of Human Necessities.

As set forth in connection with the Eighth Amendment claim, Hammonds contends that he spoke to defendant Manbeck "to try to curb the deprivations and retaliations" that he was experiencing, and Manbeck responded by telling Hammonds that he authorized those deprivations and retaliations, that he would do nothing for Hammonds, that Hammonds is the jailhouse lawyer and he should file a lawsuit, that Hammonds would not be going to "yard, shower, law library, or getting any soap or toilet paper," and that he would beat Hammonds, if Hammonds tested his resolve. *Doc. 32* at ¶58.   Hammonds also contends that on January 6, 2012, he was approved for indigent and legal materials, but defendants Manbeck and Evans denied him such items including soap, toilet paper, shampoo, a writing tablet, and

envelopes. *Id.* at ¶59.   And, according to Hammonds, Manbeck stated: "You can't file a lawsuit without your materials." *Id.*

Again, the corrections defendants deny that Hammonds was denied basic items, but, as set forth in connection with the Eighth Amendment claim, there is a genuine factual dispute about whether or when Hammonds received basic items. And given that Hammonds asserts that Manbeck made statements regarding his legal activities, a reasonable trier of fact could conclude that Manbeck withheld items from Hammonds because of his legal activities.   While Hammonds asserts that defendants Evans also denied him necessities, he has not pointed to any evidence of a causal connection between Evans's withholding and his legal activities.   Nor has he presented evidence that his legal activities were a substantial or motivating factor in any of the other defendants' actions regarding his conditions of confinement.   Accordingly, the corrections defendants other than defendant Manbeck are entitled to summary judgment as to this retaliation claim.

### H.   Equal Protection Claims.

Hammonds claims that he was treated differently from other prisoners with mental health needs who were provide treatment and transferred to the SSNU.   He also alleges numerous instances where the defendants took actions that he describes

as discriminatory and during which they allegedly made racial and other derogatory comments.

The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).   Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.   The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class such as race. *See, e.g., id.; McLaughlin v. Florida,* 379 U.S. 184, 192 (1964).   To assert a protected-class claim, the plaintiff must demonstrate that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington,* 41 F. App'x 555, 559 (3d Cir. 2005) (observing that a prima facie case under the Equal Protection Clause requires plaintiffs to prove membership in "a protected class and that they received different treatment than that received by other similarly-situated individuals"). Under this theory a plaintiff "must prove the existence of purposeful discrimination" by the defendants. *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir. 1992).

Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the

defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).   This theory allows a plaintiff to assert an equal protection claim regardless of protected class when the government irrationally treats the plaintiff differently from similarly situated individuals. *Id.* at 564; *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006).   To prevail on a class-of-one claim, the plaintiff must demonstrate that: (1) the defendants treated him differently from others similarly situated; (2) the defendants did so intentionally; and, (3) there was no rational basis for the difference in treatment. *Hill,* 455 F.3d at 239.

Hammonds has failed to come forward with evidence to support his equal protection claims.   He has not presented evidence from which a reasonable trier of fact could conclude that he was treated differently from similarly situated prisoners. Accordingly, the correction defendants are entitled to summary judgment as to the equal protection claims.

## I.   ADA Claims.

Hammonds contends that the defendants discriminated against him because of his purported mental disabilities by punishing him for acts that were the result of those disabilities and by refusing or failing to send him to the SSNU.

Title II of the ADA, under which Hammonds brings his claims, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.   As used in Title II of the ADA, "public entity" is defined as: "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 103(8) of the Rail Passenger Service Act [49 USCS § 24102(4)])." 42 U.S.C. § 12131(a).   State prisons fall squarely within the statutory definition of "public entity" in Title II of the ADA. *Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 210 (1998).   But the plain language of § 12132 applies only to public entities, not individuals. *Yeskey v. Commonwealth*, 76 F.Supp.2d 572, 575 (M.D.Pa. 1999)(holding that individuals are not liable under Title II because it prohibits

discrimination in programs of a "public entity" or discrimination "by any such

entity" and "public entity" is not defined in Title II to include individuals).

The ADA claims against the corrections defendants in their individual

capacities were dismissed, but the ADA claims against the corrections defendants in

their official capacities remain.   To establish an ADA claim, the plaintiff must

establish that (1) he has a disability; (2) he was otherwise qualified to participate in

the service, programs, or activity of the public entity; and (3) he was denied the

benefits of the service, program, or activity or was otherwise subject to

discrimination because of his disability. *Chambers ex rel. Chambers v. Sch. Dist. of*

*Philadelphia Bd of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).   Under Title II of the

ADA, "[t]he term 'qualified individual with a disability' means an individual with a

disability who, with or without reasonable modifications to rules, policies, or

practices, the removal of architectural, communication, or transportation barriers, or

the provision of auxiliary aids and services, meets the essential eligibility

requirements for the receipt of services or the participation in programs or activities

provided by a public entity." *Id.* at § 12132(2).   Further, the ADA defines a

"disability" as (1) "a physical or mental impairment that substantially limits one or

more major life activities of such [an] individual;" (2) "a record of such an

impairment," or (3) "being regarded as having such an impairment." *Id.* at

§ 12102(1)(A)-(C).   The ADA provides that the term "disability" is to be liberally construed "in favor of broad coverage" "to the maximum extent permitted by the terms of [the] Act." *Id.* at § 12102(4).

The corrections defendants argue that they are entitled to summary judgment as to Hammonds's ADA claims because the record establishes that Hammonds does not have a disability and because Hammonds was not discriminated against or denied the opportunity to participate in services or programs because of a disability.

Assuming for the sake of argument that Hammonds had a disability, the corrections defendants are nevertheless entitled to summary judgment as to the ADA claims against them because Hammonds has not come forward with evidence to establish that he was discriminated against or denied services, programs, or activities because of any such disability.   As discussed above, Hammonds has presented evidence from which a reasonable factfinder could conclude that some of the defendants took actions against him in retaliation for his filing grievances and a lawsuit, but he has not presented evidence from which a reasonable factfinder could conclude that the defendants discriminated against him because of his disability. Moreover, to the extent that Hammonds is claiming that he was denied treatment for his disability, such a claim fails under the ADA. *See Iseley v. Beard,* 220 F. Appx. 137, 141 (3d Cir. 2006)("Iseley does not claim that he was excluded from any

program on the basis of his disability.   Rather, he claims that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions.").   Because Hammonds has failed to support his ADA claim with evidence, the corrections defendants are entitled to summary judgment as to the ADA claims against them in their official capacities.[13]

## IV.   Motion for Leave to File Another Summary Judgment Motion.

The corrections defendants filed a motion for leave to file an additional summary judgment motion should the court not grant their currently pending motion on the merits.   They also filed a brief in support of that motion.   They contend that if the court denies their currently pending motion, they are prepared to produce evidence that Hammonds failed to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a) as to some of his claims, and they seek leave to file another summary judgment motion as to the exhaustion issue.

What the defendants are seeking is in essence an extension of the dispositive motions deadline.   They have not, however, shown good cause for such.   The parties were given ample time to file dispositive motions.   Although

---

[13] Although the corrections defendants also address Hammonds's due process claim that he was denied an impartial misconduct hearing, they have already been granted summary judgment as to that claim. *See Doc. 247*.

the defendants assert that it would have been a waste a judicial resources to address both the merits of Hammonds's claims and exhaustion issues in their currently pending motion for summary judgment, we disagree.   Had the defendants raised the exhaustion issue in their currently pending motion for summary judgment, it is possible that consideration of the merits of some of the claims could have been avoided.   It would, in fact, be a waste of judicial resources to entertain yet another motion for summary judgment.   Thus, we recommend that the defendants not be granted leave to file another motion for summary judgment.

Although the defendants should not be allowed to file another motion for summary judgment, "[u]nder the PLRA, exhaustion is a precondition for bringing suit under § 1983." *Small v. Camden Cnty.*, 728 F.3d 265, 269 (3d Cir. 2013).   It is a "'threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time.'" *Id.* at 270 (emphasis in original)(quoting *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010)).   There is no right to have a jury decide the issue of exhaustion. *Id.* at 271.   Rather, "exhaustion is a question of law to be determined by a judge, even if that determination requires the resolution of disputed facts." *Id.* at 269.   The issue can be decided after an evidentiary hearing.   Thus, while we recommend that the Court deny the

defendants' motion to file another motion for summary judgment, we recommend that that denial be without prejudice to the defendants seeking an evidentiary hearing on the exhaustion issue prior to trial on any remaining claims.

## V.   Motion for Separate Trials.

On June 26, 2015, Hammonds filed a motion seeking a separate trial as to the remaining claim against defendant Mummey.   He contends that separate trials are warranted to avoid delay while the corrections defendants' motion for summary judgment is pending, and he asserts that Mummey is represented by separate counsel and the issues regarding Mummey are different from those relating to the corrections defendants.

Federal Rule of Civil Procedure 42(b) provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."   "The party seeking bifurcation has the burden of proving that separation is necessary "'in light of the general principle that a single trial tends to lessen delay, expense and inconvenience to all parties.'"" *Mayo v. City of York, PA*, No. CIV A 104-CV-2272, 2007 WL 1227726, at *1 (M.D. Pa. Apr. 25, 2007)(quoting *Carter v. City of Philadelphia,* No. CIV. A. 97-CV-4499, 2000 WL 1368010, at *1 (E.D. Pa.

Sept. 12, 2000)(quoting *McCrae v. Pittsburgh Corning Corp.*, 97 F.R.D. 490, 492 (E.D.Pa.1983)).   Factors the district court should consider before ordering separate trials include: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *Karlo v. Pittsburgh Glass Works, LLC*, No. 2:10-CV-1283, 2015 WL 6134052, at *2 (W.D. Pa. Oct. 16, 2015).   The decision is within the district court's discretion. *Mayo*, 2007 WL 1227726, at *1.

Hammonds's primary reason for seeking a separate trial as to Mummey is that, at the time he filed his motion, the claim against Mummey was ready for trial, but the corrections defendants' motion for summary judgment was still pending. Now, given this Report and Recommendation, the corrections defendants' motion for summary judgment will most likely be decided in the near future, thus lessening Hammonds's concern over delay.   The one remaining claim against Mummy is a retaliation claim.   While that claim involves a separate event from the events underlying the remaining retaliation claims against the corrections defendants, there is a common thread among the claims—Hammonds's contention that the retaliation

84

in all instances was a result of his previous lawsuit and grievances.   Hammonds

does not contend that he will be prejudiced by a single trial, and any potential

prejudice involved with trying separate claims in one trial can be dealt with by jury

instructions and a special verdict slip.   In sum, the factors favoring separate trials do

not outweigh the judicial inefficiency of conducting separate trials.   Thus, we will

recommend that Hammonds's motion for separate trials be denied.


## VI.   Recommendations.

Accordingly, for the foregoing reasons, we recommend that the motion (doc.

281) for summary filed by the corrections defendants be granted in part and denied

in part.   More specifically, we recommend that the corrections defendants be

granted summary judgment as to Hammonds's Eighth Amendment claims based on

the denial of medical care and mental health treatment except that defendants

Alshefski and Kufro be denied summary judgment as to the Eighth Amendment

claim based on their response to Hammonds's purported threat of suicide.   Further,

we recommend that the corrections defendants be granted summary judgment as to

the Eighth Amendment food claims.   We recommend that defendants Manbeck,

Evans, Collins, and Damiter be denied summary judgment as to the Eighth

Amendment conditions-of-confinement claims.   We further recommend that

defendants Purcell, Kramer, Anspach, and Moss be denied summary judgment as to the Eighth Amendment use-of-force claim.   Additionally, we recommend that defendants Kuras, Vicki Stanishefski, and Myron Stanishefski be granted summary judgment as to the retaliation claims against them and that the corrections defendants other than defendant Mabeck be granted summary judgment as to the retaliation claim for denial of basic necessities.   We recommend that the corrections defendants otherwise be denied summary as to Hammonds's remaining retaliation claims.   Finally, we recommend that the corrections defendants be granted summary judgment as to the equal protection and ADA claims.

We further recommend that the corrections defendants' motion (285) for leave to file another motion for summary judgment be denied without prejudice to the defendants seeking an evidentiary hearing and determination regarding the exhaustion issue.   We also recommend that Hammonds's motion (doc. 273) for separate trials be denied.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.   Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the

portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.   The briefing requirements set forth in Local Rule 72.2 shall apply.   A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.   The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 4th day of January, 2016.


*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge